Filed 3/22/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> ARDITH HUBER, <br><br>     Defendant and Appellant. | A144214 <br><br> (Humboldt County <br> Super. Ct. No. DR110232) <br><br> ORDER MODIFYING OPINION <br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 25, 2019, be modified as follows:

1.   On pages 26–27, in the paragraph starting with "All in all," in the sentence that begins "While we do not agree," delete the word "involved" so the sentence reads as follows:

> While we do not agree that *Bracker* preemption analysis may be short-circuited under *Wagnon* by characterizing the conduct at issue as off-reservation[17]—what we have here is a mix of on-reservation and off-reservation activity—we are nonetheless persuaded that the *Bracker* test tips in favor of the People on this record.

There is no change in the judgment.

Dated:_____          _____, Acting P.J.

1

A144214/*People ex rel. v. Huber*

| | |
|---|---|
| Trial Court: | Humboldt County Superior Court. |
| Trial Judge: | Honorable W. Bruce Watson. |
| Counsel for Appellant: | Law Office of Dario Navarro, Dario F. Navarro; Fredericks Peebles & Morgan, Michael A. Robinson, for defendant and appellant. |
| Counsel for Respondent: | Xavier Becerra, Attorney General, Karen Leaf, Senior Assistant Attorney General, Nicholas M. Wellington, Supervising Deputy Attorney General for plaintiff and respondent. |

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARDITH HUBER,<br><br>    Defendant and Appellant. | A144214<br><br>(Humboldt County<br>Super. Ct. No. DR110232) |


## I.    INTRODUCTION

This appeal is from a summary adjudication order and permanent injunction entered in an enforcement action by the Attorney General on behalf of the People of the State of California against Ardith Huber, a member of the Wiyot Band of Indians. Huber owns and operates a tobacco smokeshop on the Table Bluff Rancheria, an area where the Wiyots live just outside of Crescent City, in Humboldt County.

The Attorney General's complaint alleges a claim for violation of the Unfair Competition Law, Business and Professions Code section 17200 et seq. (the UCL) and cites as predicate "unlawful acts" violations of three statutes applicable to cigarette sales and marketing, the Tax Stamp Act (Rev. & Tax. Code, § 30161), the Directory Act (Rev. & Tax. Code, § 30165.1, subd. (e)(2)), and the Fire Safety Act (Health & Saf. Code, § 14951, subd. (a)). He also pleads, as separate claims, violations of the Directory Act

1

and the Fire Safety Act. The trial court granted summary adjudication to the People, denied it to Huber, and entered a permanent injunction on all three claims.

Although Huber's position has evolved in the course of this appeal, her primary argument is an attack on subject matter jurisdiction. She contends that, under a federal statute granting California courts plenary criminal jurisdiction but limited civil jurisdiction over cases arising on Indian reservations, the trial court lacked power to proceed on any of the three claims in this case. She also argues that, under the doctrine of Indian preemption, which limits the reach of state law to conduct by Indians on Indian reservations, all the statutes the Attorney General seeks to enforce here are preempted by paramount federal authority.

We affirm.

## II. BACKGROUND

A. *Huber Enterprises and the Table Bluff Rancheria*

Huber runs a sole proprietorship out of her home called Huber Enterprises, selling cigarettes at retail and wholesale. Although Huber once sold other brands of cigarettes, after 2007 she has sold exclusively Native American brands, which she describes as "cigarettes manufactured by Indians on Indian lands, . . . shipped and sold through Indian and tribally-owned distributors to Indian and tribally-owned retail smokeshops located on Indian lands."

The retail component of Huber's enterprise is onsite business. Customers include tribe members and nonmembers who come to the Table Bluff Rancheria to make purchases there. The wholesale component of the enterprise is with "over two dozen Indian smokeshops owned either by Indian tribes or [i]ndividual tribal members and operated within [other] . . . recognized Indian reservation[s]." Deliveries are made to these "inter-tribal" customers by truck, using California highways.

Huber Enterprises is licensed to do business pursuant to the Wiyot Tribal Business Code and the Wiyot Tribal Tobacco Licensing Ordinance (Ordinance No. 01-10). Ordinance No. 01-10 was promulgated June 14, 2010, for purposes of, inter alia,

2

"promot[ing] tribal economic development," "regulat[ing] and licens[ing] the manufacture, distribution, wholesaling, and retailing of tobacco products," "complement[ing] and enforc[ing] federal standards relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, and use of tobacco products," and "encourag[ing] and foster[ing] traditions and culture of the Tribe."

Ordinance No. 01-10 requires licensees to pay—and Huber Enterprises does pay—a quarterly excise tax administered through a tribal tax stamp system. Taxes collected in this manner are deposited into a dedicated Tribal Tobacco Fund, earmarked solely for the expenses of "[t]obacco-related school and community health education programs," "[s]moking and tobacco-use prevention measures," and "[a]ssistance to tribal and community members for cessation of smoking and tobacco use."

There is no dispute in this case that today the Wiyot Band of Indians is a federally recognized tribe and that the Table Bluff Rancheria falls within the broad definition of "Indian country" under federal law, as do individual allotments of land to enrolled tribe members such as Huber. (18 U.S.C. § 1151; see *Oklahoma Tax Com. v. Sac & Fox Nation* (1993) 508 U.S. 114, 123 ["Indian country" encompasses "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States"].)[1]

_____

[1] Federally protected territory in California falling within the federal definition of "Indian country" has a unique history that differs in some respects from the history of federally protected Indian lands in other states, where in many cases treaties with tribes determined the boundaries of tribal territory. (See Cohen, Handbook of Federal Indian Law (2012 ed.) § 3.04[2][a], p. 185 (Cohen).) Early in the 20th century, the United States sought to improve "the landless, homeless or penurious state of many California Indians" by purchasing numerous small tracts of land known as " '[r]ancherias.' " (*Williams v. Gover* (9th Cir. 2007) 490 F.3d 785, 787.) The United States holds these rancheria lands in trust for resident Native Americans, controlling the land pursuant to a "special fiduciary duty owed by the United States to the Indian people." (*Table Bluff Band of Indians v. Andrus* (N.D.Cal. 1981) 532 F.Supp. 255, 258.) A federal statute

3

B.      *The Directory Act, the Fire Safety Act, and the Tax Stamp Act*

At the center of the appeal are three sets of statutes governing different aspects of the sale and distribution of cigarettes in California. In order to provide some general legal context and set the stage for the specific issues framed by the appeal, we begin by summarizing these statutes.

First, California, along with many other states, has enacted legislation designed to implement the provisions of the 1998 Tobacco Master Settlement Agreement (the MSA).[2] Under the pertinent California statutes, cigarettes sold in this state must be produced by manufacturers who either (a) have signed the MSA and agreed to pay substantial sums to the state to cover, among other things, health care costs generated by tobacco use among Californians, or (b) in lieu of signing the MSA, have agreed to pay sufficient funds into a reserve fund in escrow to guarantee a source of compensation should liability arise. (Health & Saf. Code, §§ 104555–104557.) Under the Directory Act, the Attorney General maintains a published list of all cigarette manufacturers who have annually certified their compliance with the requirements of the MSA or the alternative escrow funding requirements. (Rev. & Tax. Code, § 30165.1, subds. (c) &

passed in 1958 known as the California Rancheria Act (Pub.L. No. 85-671 (Aug. 18, 1958) 72 Stat. 619-621), amended in 1964 (Pub.L. No. 88-419 (Aug. 11, 1964) 78 Stat. 390-391) (the Rancheria Act) established a process for terminating the trust relationship between the United States and Native Americans residing on 41 enumerated California rancherias and reservations. (*Table Bluff,* at p. 258.) A plan of termination for the Table Bluff Rancheria was prepared under the Rancheria Act, but because federal authorities failed to carry out various prerequisites to termination, the plan never took effect. (*Id.* at p. 259.) Throughout this opinion, we will occasionally use the term "reservation," equating it with rancheria, since there is no dispute that the Table Bluff Rancheria qualifies as "Indian country," and since many of the pertinent United States Supreme Court cases arose in states where tribes live on reservations.

[2] See Annotation, Validity, Construction, Application, and Effect of Master Settlement Agreement (MSA) Between Tobacco Companies and Various States, and State Statutes Implementing Agreement; Use and Distribution of MSA Proceeds (2007) 25 A.L.R.6th 435, section 2 (summarizing mechanics of MSA and state statutes implementing its provisions).

(d).)  It is categorically illegal for any "person" to "sell, offer, or possess for sale in this state, ship or otherwise distribute into or within this state" cigarettes that are not in compliance with the Directory Act.  (*Id.,* § 30165.1, subd. (e)(2); see Health & Saf. Code, § 104555.)

Second, under the Fire Safety Act, any manufacturer of cigarettes sold in California must meet specified testing, performance, and packaging standards established for the purpose of minimizing the fire hazards caused by cigarettes.  (Health & Saf. Code, §§ 14951, subd. (a)(1)–(3), 14952–14954.)  This statute provides that all cigarettes sold in this state must, among other things, be packaged in a specified manner and certified with the State Fire Marshal as compliant with these safety standards.  (*Id.*, § 14951, subd. (a).)  It is categorically illegal for any "person" to "sell, offer, or possess for sale in this state cigarettes" that do not comply with the Fire Safety Act.  (*Ibid.*)

Third, to reduce smoking and fund healthcare research related to diseases caused by smoking (Rev. & Tax. Code, §§ 30131 & 30121 et seq.), California imposes excise taxes that "shall be paid by the user or consumer" (*id.,* § 30107) but that must be collected by distributors at the time of sale and remitted by them to the state (*id.,* § 30108).  Compliance with this remittance obligation is administered under the Tax Stamp Act, which requires all cigarette packages sold in California to have tax stamps affixed to them.  (Rev. & Tax. Code, § 30161.)  Subject to exceptions, it is illegal for any "person" to "knowingly possess[], or keep[], store[], or retain[] for the purpose of sale, or sell[] or offer[] to sell, any package of cigarettes to which there is not affixed" a tax stamp required by the Tax Stamp Act.  (Rev. & Tax. Code, § 30474, subd. (a).)

C.     *Procedural History*

After sending two cease-and-desist letters charging Huber with violating various provisions of state law governing distribution and sales of cigarettes, the Attorney General filed this action in Humboldt County in March 2011.  The complaint pleaded three causes of action.  The first alleged violation of the Directory Act.  The second alleged violation of the Fire Safety Act.  And the third alleged violation of the UCL,

5

specifying violations of the Tax Stamp Act, the Directory Act, and the Fire Safety Act as predicate "unlawful acts" warranting entry of a permanent injunction and an award of civil penalties.

Specifically, it was alleged that Huber Enterprises sold cigarettes in packages without an affixed tax stamp and failed to collect and remit excise taxes, all in violation of the Tax Stamp Act (Rev. & Tax. Code, § 30161); sold cigarettes purchased from manufacturers not listed by the Attorney General on the statewide tobacco directory, in violation of the Directory Act (*id*, § 30165.1, subd. (e)(2)); and sold cigarettes in packaging that does not meet required safety standards, in violation of the Fire Safety Act (Health & Saf. Code, § 14951, subd. (a)).[3]

On cross motions for summary adjudication, the trial court denied Huber's motion; granted the Attorney General's motion in part, leaving open triable issues concerning civil penalties; and entered a permanent injunction. By its terms, the injunction applies only to sales to nonmembers of the Wiyot Tribe and permits Huber to continue operating so long as she complies with the Directory Act, the Fire Safety Act, and the Tax Stamp Act. This appeal followed.

### III.  DISCUSSION

Only the grant of the permanent injunction is on appeal. " 'A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate. A permanent injunction . . . is a final judgment on the merits.' " (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1041.) Normally, "[t]he trial court's decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) But where an appeal attacks the legal premises

---

[3] There is no standalone cause of action for violation of the Tax Stamp Act.

6

of a permanent injunction on undisputed ultimate facts—as is the case here—our review is de novo.  (*Dawson,* at p. 1041.)

Because the order granting summary adjudication in favor of the Attorney General and denying it to Huber supplies the basis for the permanent injunction, we must in turn review whether summary adjudication was correctly granted as to each of the three causes of action.  We review de novo an order granting summary judgment or summary adjudication.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)  "As a practical matter, ' "we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." ' "  (*Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 536.)  A summary adjudication motion "proceed[s] in all procedural respects as a motion for summary judgment."  (Code Civ. Proc., § 437c, subd. (f)(2).)

A.     *Subject Matter Jurisdiction*

The United States Supreme Court "first addressed the sovereign status of [Indian] tribes in three opinions known today as the Marshall Trilogy after their author, Chief Justice John Marshall.  (See *Worcester v. The State of Georgia* (1832) 31 U.S. 515 . . . ; *Cherokee Nation v. Georgia* (1831) 30 U.S. 1 . . . (*Cherokee Nation*); *Johnson v. M'Intosh* (1823) 21 U.S. 543 . . . .)  Broadly speaking, these cases established that 'states lack jurisdiction in Indian country, that tribes are "domestic dependent nations" to whom the United States owes a fiduciary obligation, and that Indian affairs are the exclusive province of the federal government.' "  (*People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 233–234.)  Within this dependency relationship as Chief Justice Marshall conceived of it, relations between tribes and individual states are governed exclusively by the United States, and thus, absent express congressional authorization by treaty or legislation, state law does not extend to Indian territory.  (See *Worcester v. The State of Georgia, supra,* 31 U.S. at p. 561.)  From this basic principle evolved a closely related corollary—that absent congressional authorization, the jurisdiction of state courts to

adjudicate cases arising on Indian lands is limited by the right of reservation Indians to govern themselves.  (See *Williams v. Lee* (1959) 358 U.S. 217, 220, 222–223 (*Williams*).)

Huber's legal position in the course of this appeal has been a bit of a moving target.  Her main argument below, and here on appeal—until she retained new counsel and began shifting ground—is that California courts have no subject matter jurisdiction over this case because it involves her on-reservation activities as a member of the Wiyot Tribe.  Central to that argument is a federal statute known as Public Law 280.  (Pub.L. No. 83-280 (Aug. 15, 1953) 67 Stat. 588-590).  Under Public Law 280, Congress granted California and five other states[4] plenary criminal jurisdiction over "offenses committed by or against Indians" within Indian country (18 U.S.C. § 1162(a); see *People v. McCovey* (1980) 36 Cal.3d 517, 535), and limited civil jurisdiction over "causes of action between Indians or to which Indians are parties" in cases arising in Indian country (28 U.S.C. § 1360(a); see *Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1147, fn. 4).[5]  Construing the statute narrowly so that it does not grant these states general civil

---

[4] Besides California, the other listed Public Law 280 states, as the statute was originally enacted in 1953, were Minnesota, Nebraska, Oregon, and Wisconsin.  Alaska was added by Act of August 8, 1958, Public Law No. 85-615, section 1, 72 Statutes 545 (codified at 18 U.S.C. § 1162(a), 28 U.S.C. § 1360(a)).  These six states are sometimes known as "mandatory" Public Law 280 states.  (See Cohen, *supra,* § 6.04[3][a], p. 538, fn. 50.)  Public Law 280 offered the option to other states to accept the same jurisdiction, and eventually 10 additional states, sometimes known as "optional" Public Law 280 states (Arizona, Idaho, Florida, Iowa, Montana, Nevada, North Dakota, South Dakota, Utah, and Washington), accepted jurisdiction under its terms, in whole or in part.  (See Cohen, *supra*, § 6.04[3][a], pp. 537–538 & fn. 47.)

[5] Section 4 of Public Law 280, 28 U.S.C. § 1360, provides in part as follows:

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

regulatory control over Indian tribes, the high court held in *Bryan v. Itasca County* (1976) 426 U.S. 373, 385 (*Bryan*) that section 4 of Public Law 280 confers limited adjudicative jurisdiction to resolve private civil disputes.  A public enforcement action by the Attorney General does not fall within that limited jurisdictional grant, Huber argued.

But in her reply brief, Huber began to change tack.  While still citing *Bryan* and Public Law 280, she made no mention of adjudicative jurisdiction and instead argued the case can and should be decided in her favor on preemption grounds, a secondary line of argument in her opening brief.  Because Ordinance No. 01-10 authorized her to operate as she did, she claimed, the Attorney General seeks to "nullify" tribal law in derogation of tribal sovereignty.  The thrust of Huber's argument, as reframed in reply, is that the People "seek[] to inflict upon [her] a comprehensive civil regulatory regime that egregiously violates the letter and spirit of Public Law 280" and violates the right of the Wiyots to " 'make their own laws and be governed by them.' "  So thoroughgoing is the intrusion on Wiyot sovereignty, Huber tells us, it is difficult to imagine a "more invasive and coercive regulatory regime . . . short of military occupation of the reservation."

Huber's position shifted again at oral argument, where she announced her

---

*"State of                                        Indian country affected*

[¶ . . . ¶]

"California………………..…All Indian country within the State.

[¶ . . . ¶]

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."  (Italics added.)

9

agreement with the People that "Public Law 280 is irrelevant," stated "we're . . . assuming for the sake of argument there is jurisdiction," and urged that the appeal should rise or fall on the question of preemption. We initially declined to accept this concession—subject matter jurisdiction, of course, is not a matter for litigants to control by consent or waiver—and we filed an opinion agreeing in part with the jurisdictional position advanced in Huber's opening brief. Given the narrow construction placed on the scope of state court adjudicatory jurisdiction in *Bryan*, *supra*, 426 U.S. 373, we held that the trial court lacked jurisdiction to proceed on the People's first cause of action for violation of the UCL, but that it had jurisdiction to proceed on the other two causes of action under the grant of criminal/prohibitory jurisdiction in Public Law 280. (18 U.S.C. § 1162(a).)

Following a grant of rehearing, the Attorney General supplied additional authority addressing the threshold issue of adjudicative jurisdiction. Based on that authority, we are now persuaded that the key United States Supreme Court case here is not *Bryan*, but *Williams*.

At issue in *Williams* was whether a state court had jurisdiction to adjudicate a debt collection action brought by a non-Indian against a Navajo Reservation Indian for debts the Indian incurred at the non-Indian's on-reservation store. (*Williams, supra*, 358 U.S. at p. 218.) The Supreme Court there articulated the long-standing general rule controlling state court jurisdiction in actions involving Indians, i.e., "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." (*Id.* at p. 220.) Applying that rule to the facts before it—where the debt collection claim at issue arose entirely on the Navajo Reservation, the Navajo Reservation had a well-developed court system, and Arizona's Enabling Act and Constitution expressly disclaimed jurisdiction over those Indian lands—the court held: "There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to

10

govern themselves." (*Williams, supra,* 358 U.S. at p. 223; see also *id.* at p. 222, fn. 10.)

If Public Law 280 is viewed through the prism of *Williams*, what Section 4 of the statute did was authorize state court adjudicative jurisdiction in specified civil cases where the exercise of such jurisdiction would infringe Indian sovereignty, unless authorized by Congress. But absent infringement under *Williams*, there is no need to consider Public Law 280 and the general jurisdiction of state courts is the default rule. (See *Powell v. Farris* (Wash. 1980) 620 P.2d 525, 527–528 [*Williams* test applied to support finding of state court jurisdiction in partnership dissolution action against tribe member operating smokeshop under business license issued by tribal council]; *State Securities, Inc. v. Anderson* (N.M. 1973) 506 P.2d 786, 788–789 (*Anderson*) [*Williams* test applied to support finding of state court jurisdiction in breach of contract action against tribe member based on contract entered off reservation].) Under that default rule, this case falls within the jurisdiction conferred on the superior courts of this state by article VI, section 10 of the California Constitution, a grant of jurisdiction that long predates Public Law 280. (Cal. Const., art. VI, § 10, former art. VI, § 5.) Because nothing in the language or legislative history of Public Law 280 indicates the statute was meant to divest states of pre-existing jurisdiction, federal statutory authorization is not required. (*Three Affiliated Tribes v. Wold Engineering* (1984) 467 U.S. 138, 150 (*Three Affiliated Tribes I*).)[6]

---

[6] *Three Affiliated Tribes I* arose in North Dakota, an optional Public Law 280 state that, by statute in 1963, elected to assume jurisdiction over civil cases arising in Indian country. (*Three Affiliated Tribes I, supra,* at p. 144.) At issue there was a lawsuit by an Indian tribe alleging negligence and breach of contract against a contractor for poor workmanship in the construction of a water supply system on its reservation. (*Id.* at p. 141.) There was a counterclaim by the contractor for failure to pay. (*Id.* at p. 142.) The tribe took the position it was entitled to sue in state court, but the trial court granted the contractor's motion to dismiss the suit for lack of jurisdiction. (*Id.* at pp. 142, 145.) "Even before North Dakota moved to . . . assume full jurisdiction under Pub.L. 280, the North Dakota Supreme Court had taken an expansive view of the scope of state-court jurisdiction over Indians in Indian country," holding that North Dakota courts had

11

There are no California cases applying *Williams* in this way, but there does appear to be a deep vein of out-of-state case law doing so. (*C'Hair v. Court of Ninth Judicial District* (Wyo. 2015) 357 P.3d 723, 730 (*C'Hair*) [citing illustrative cases from various states; "[w]hen considering the limitations on state court jurisdiction over matters potentially implicating both state and tribal interests, it is clear that the governing analysis has long been and continues to be the *Williams* test"].) These cases turn on a careful delineation of the "tribal status of the parties, . . . the on and off-reservation contacts associated with the involved controversy, and the specific governmental interest militating for and against state court jurisdiction."[7] Whether a tribe member is being

_____

jurisdiction in all civil cases arising on Indian lands, excepting only cases "involving interests in Indian lands themselves." (*Three Affiliated Tribes I*, *supra*, 467 U.S. at pp. 143–144, italics omitted; see *Vermillion v. Spotted Elk* (N.D. 1957) 85 N.W.2d 432, 438 (*Vermillion*), overruled by *Gourneau v. Smith* (N.D. 1973) 207 N.W.2d 256, 258.) Under *Vermillion* the entire state court action in *Three Affiliated Tribes I* would have been permitted to proceed, regardless of whether the tribe consented to be sued on the counterclaim. But because North Dakota's statutory assumption of Public Law 280 jurisdiction was conditioned on tribal consent to jurisdiction, the North Dakota Supreme Court read its Public Law 280 assumption statute as a disclaimer of all previously recognized jurisdiction in the absence of such consent. (*Three Affiliated Tribes I*, *supra*, at pp. 144–146.) It therefore affirmed the dismissal of the entire suit. (*Id.* at pp. 145–146.) While recognizing that the issue of jurisdiction was ultimately a matter of state law, the high court vacated the judgment because the dismissal appeared to be based on a misreading of Public Law 280. (*Three Affiliated Tribes I*, *supra*, at pp. 141, 151, 153–154.) The court directed the North Dakota Supreme Court to reconsider, explaining that nothing in Public Law 280 required a state, when opting to assume Public Law 280 jurisdiction, to divest itself of what the court called "pre-existing and otherwise lawfully assumed jurisdiction." (*Three Affiliated Tribes I*, *supra*, at pp. 141, 150, 159.) The rationale of *Three Affiliated Tribes* applies here. Although there is no equivalent to *Vermillion* in California, we see no reason to doubt that, in 1953, Congress legislated with the understanding that California courts had preexisting, general jurisdiction over civil cases so long as the exercise of that jurisdiction did not infringe Indian sovereignty. (See Cal. Const., art. VI, §10, former art. VI, § 5.)

[7] Conference of Western Attorneys General, American Indian Law Deskbook (May 2018), Nonstatutory Adjudicatory Jurisdiction § 6:11.

sued in state court for conduct that took place entirely within the boundaries of his or her reservation is of central importance,[8] but is not always dispositive.[9]  The cases finding no jurisdiction tend to focus on such things as whether the claims implicate tribal self-governance or membership,[10] interests in real property owned by the tribe members within reservation boundaries[11] or matters of domestic relations among tribe members.[12] The cases upholding jurisdiction, on the other hand, tend to focus on such things as whether a tribe member is seeking access to state court (as in *Three Affiliated Tribes I*),

---

[8] *Langdeau v. Langdeau* (S.D. 2008) 751 N.W.2d 722, 730 ("the purpose [of] the [*Williams*] [t]est is to protect tribal sovereignty in the realm of disputes involving Indians that take place *entirely* on a reservation" (original italics)); *Roe v. Doe* (N.D. 2002) 649 N.W.2d 566, 578–579 (*Williams* prohibits state court jurisdiction only for claims involving conduct on a reservation; collecting cases).

[9] *Compare C'Hair*, *supra*, 357 P.3d at page 740 (state court had jurisdiction over personal injury claim brought by nonmember against tribal member with respect to on-reservation accident on state highway) *with Hinkle v. Abeita* (N.M.Ct.App. 2012) 283 P.3d 877, 878, 880 (state court lacked jurisdiction over personal injury suit by non-Indian against tribal member arising from on-reservation accident on state highway).

[10] *Healy Lake Village v. Mt. McKinley Bank* (Alaska 2014) 322 P.3d 866, 875 (dismissal affirmed where issues presented would "require the state court to apply tribal law to determine the outcome of a tribal election dispute and issues of tribal membership" and thus would ignore precedent "emphasiz[ing] the need to respect tribal self-governance").

[11]*Gustafson v. Estate of Poitra* (N.D. 2011) 800 N.W.2d 842, 846–848 (declining to exercise jurisdiction over property dispute brought by non-Indian against tribal member concerning Indian-owned real property located within reservation).

[12] *McKenzie County Social Service Bd. v. C.G.* (N.D. 2001) 633 N.W.2d 157, 161 (declining to exercise jurisdiction over action seeking paternity and child support order for child conceived on reservation); see *Montana v. United States* (1981) 450 U.S. 544, 564 ("in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members").

13

agreed to be sued in state court,[13] or—especially pertinent here—engaged in conduct that occurred entirely or in part off-reservation.[14]

The Attorney General argues that the claims he asserts arose off-reservation, while Huber argues the opposite. To resolve the jurisdictional issue presented here, we see no need for binary analysis of where the claims arose. Under the *Williams* test, " '[a]s the activity in question moves off the reservation the state's governmental and regulatory interest increases dramatically, and federal protectiveness of Indian sovereignty lessens.' " (*Begay v. Roberts* (Ariz.Ct.App. 1990) 807 P.2d 1111, 1115 (*Begay*); see *Smith Plumbing Co. v. Aetna Casualty & Surety Co.* (Ariz. 1986) 720 P.2d 499 (*Smith*) ["[T]he Tribe's reaching out outside the confines of the reservation to engage in commercial activity—without the concomitant reaching in by non-Indians—makes this a proper instance of nondiscriminatory adjudication of a contract claim by the courts of this state."].) Because so much of Huber's activity was directed to off-reservation business, this case, in our view, comfortably aligns with such cases as *Anderson*, *Begay* and *Smith*, where the extent of the off-reservation conduct at issue tipped the scale in favor of exercising state court jurisdiction.

Applying *Williams* to the facts presented on this record, the exercise of jurisdiction here does not infringe tribal sovereignty. The case implicates no issues of tribal self-governance, tribal membership, ownership of any tribe member's real property, or domestic relations among tribe members. Huber's business is located

---

[13] *Outsource Services Management, LLC v. Nooksack Business Corp.* (Wash. 2014) 333 P.3d 380, 384 (upholding state court jurisdiction in contract suit against tribal business enterprise where contract contained consent to jurisdiction clause and explaining "[w]hile [enterprise] is correct that parties cannot confer subject matter jurisdiction by agreement or consent, that does not mean we cannot take [its] consent into account when determining whether jurisdiction would infringe on the tribe's right to self-rule").

[14] *State ex rel. Vega v. Medina* (Iowa 1996) 549 N.W.2d 507, 510 (exercising jurisdiction over action to establish tribe member's paternity and support obligation with respect to child conceived off reservation).

on the Wiyot reservation, but all the claims at issue are directed to her sales of contraband cigarettes to non-members of the Wiyot tribe, both at the retail level (based on promotions directed to off-reservation customers enticing them to visit her on-reservation business) and at the wholesale level (based on deliveries by truck off the reservation to other tribes). While these claims involve a Native American residing and doing business in Indian country, they cannot be said to have arisen entirely there. Nor does the Wiyot tribe have a court system that might be undermined by a California court's assertion of jurisdiction involving a Wiyot tribe member and a business she operates on Wiyot tribal lands. Unlike the situation in *Williams* with Navajos in Arizona, there has never been any disclaimer by the state of California of any aspect of its jurisdiction over Indian country within the territorial boundaries of this state.

Notably, state courts around the country in a line of cases involving public enforcement actions against Native American cigarette sellers operating smokeshops on their reservations while offering tobacco products for sale off-reservation, have all rejected challenges to subject matter jurisdiction. In *State v. Maybee* (Or.Ct.App. 2010) 232 P.3d 970 (*Maybee*), for example, the Oregon Court of Appeals considered a factual situation very similar to the one we have here. There, Maybee, a Native American operating a smokeshop business on a reservation in New York, purchased cigarettes from a variety of sources and resold them to internet buyers elsewhere in the country. (*Id.* at p. 972.) Oregon sued Maybee in state court, charging him with violating its Directory Statute with respect to his sales of contraband cigarettes to Oregonians. (*Maybee, supra,* at p. 972.) Maybee argued that the Oregon courts lacked subject matter jurisdiction, contending that because he ran his business without leaving his reservation, the state's claims all arose in Indian country, and thus Oregon courts lacked jurisdiction because asserting it over him would infringe on tribal rights. (See *id.* at pp. 972–973.) Rejecting this challenge to subject matter jurisdiction, the Court of Appeals first noted that, "[i]n contrast to the rule articulated in *Williams* . . . , state courts *may* exercise jurisdiction in

15

civil cases involving Native Americans and relating to conduct that extends beyond the reservation's boundaries." (*Id*. at p. 973.) Then the appellate panel explained that, while Maybee did not leave his reservation in New York, his websites were accessible to customers in Oregon and he received orders by telephone and the internet from customers located in Oregon. (*Ibid*.) Thus, the panel concluded that Oregon state courts had jurisdiction to adjudicate. (*Id*. at pp. 973–974.)

*Maybee* confirms that where there is no infringement of tribal sovereignty, Public Law 280 does not figure into the jurisdictional analysis. Oregon, like California, is a mandatory Public Law 280 state. But similar cases involving Native American smokeshops "exporting" tobacco products off-reservation have arisen in optional Public Law 280 states and in non-Public Law 280 states. Appellate courts in several of these cases have reached the same conclusion that the Oregon Court of Appeals did in *Maybee*, adopting similar reasoning. (See *Health and Human Services v. Maybee* (Maine 2009) 965 A.2d 55, 56–57 [non-Public Law 280 state]; *State ex rel. Wasden v. Native Wholesale Supply Co.* (Idaho 2013) 312 P.3d 1257, 1261–1263 [optional Public Law 280 state].) Other smokeshop cases, including the recent opinion from our Third District colleagues in *People ex rel. Becerra v. Rose* (2017) 16 Cal.App.5th 317, 329–331 (*Rose*), reach the same result without exploring the basis for subject matter jurisdiction. (See *State v. Native Wholesale Supply* (Okla. 2010) 237 P.3d 199.) None of the courts in any of these various smokeshop cases saw an obstacle to proceeding in the absence of an express congressional grant. In accord with them, we conclude that the trial court here correctly ruled it had subject matter jurisdiction to entertain this case.

B.      *Preemption*

        1.      Applicable Principles

"The relation between the Indians and the states has by no means remained constant since the days of John Marshall." (*Organized Village of Kake v. Egan* (1962) 369 U.S. 60, 71 (*Village of Kake*).) Over the many years since that time, "Congress has to a substantial degree opened the doors of reservations to state laws" (*id*. at p. 74) to

16

such a degree that " '[o]rdinarily,' . . . 'an Indian reservation is considered part of the territory of the State.' " (*Nevada v. Hicks* (2001) 533 U.S. 353, 361–362; see also *Village of Kake*, *supra*, at p. 72; *Acosta v. County of San Diego* (1954) 126 Cal.App.2d 455, 463.) Although as of the early 1960s, it was still true that the "[d]ecisions of [the United States Supreme Court were] few as to the power of the states when not granted Congressional authority to regulate matters affecting Indians" (*Village of Kake*, *supra*, at p. 74), a substantial body of high court case law has now developed concerning when, in the absence of an express congressional grant of power, state law may be applied to reservation Indians.

The high court summarized the applicable principles in *White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136 (*Bracker*) as follows: "Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3. [Citation.] This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations.] Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' [Citations.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop,' [citation] against which vague or ambiguous federal enactments must always be measured.[15]

---

[15] United States Supreme Court cases decided after *Bracker* have restated the idea that infringement of Indian sovereignty is an "independent" barrier to the application of state law, emphasizing the language in the *Bracker* opinion that it is a consideration to be taken into account as part of the "backdrop" in determining congressional intent and, as

17

"The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law.  Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other.  The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law.  [Citation.] . . . [T]his tradition is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.  Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.  [Citation.]  We have thus rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required.  [Citation.]  At the same time any applicable regulatory interest of the State must be given weight [citation], and 'automatic exemptions "as a matter of constitutional law" ' are unusual.  [Citation.]

"When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.[16] . . .  More difficult questions arise where . . . a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.  In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies

---

such, simply part of a highly context-sensitive balancing of interests inquiry.  (*Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 884 (*Three Affiliated Tribes II*); see *Rice v. Rehner* (1983) 463 U.S. 713, 720–725 (*Rice*).)

[16] *New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 331–332 (*New Mexico II*) (only "in exceptional circumstances [may] a State . . . assert jurisdiction over the on-reservation activities of tribal members").

that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.  This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.  [Citations.]" (*Bracker*, *supra*, 448 U.S. at pp. 142–145.)

      2.    *Moe*, *Colville*, and *Milhelm*

*Bracker, supra,* 448 U.S. 136 summed up an area of law in which *Moe v. Confederated Salish & Kootenai Tribes, Etc.* (1976) 465 U.S. 463 (*Moe*), *Washington v. Confederated Tribes of Colville* (1980) 447 U.S. 134 (*Colville*), and *Department of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.* (1994) 512 U.S. 61 (*Milhelm*)—each involving cigarette sales on Indian reservations and the extent to which state taxation and regulation schemes may be applied to those sales—are leading decisions.  Thus, the parties rightly devote a great deal of attention to these three cases in their briefs.  Although ultimately disagreeing about how the *Moe-Colville-Milhelm* line of precedent should be applied here, they largely agree about what each case held.

*Moe, supra*, 425 U.S. 463 involved consolidated appeals in two cases that arose on the Flathead reservation in Montana, where a member of the Confederated Salish and Kootenai Tribes operated retail smokeshops.  (*Moe*, at pp. 465–466.)  A Montana statute required all tobacco vendors to hold state-issued licenses, and all licensed vendors to collect an excise tax on retail sales of cigarettes by affixing tax stamps on cigarettes sold at retail.  (*Id.* at p. 467.)  When two tribe members were arrested by Montana authorities for the misdemeanor offenses of operating without a license and selling cigarettes without tax stamps affixed to them, they sued in federal district court to enjoin enforcement.  (*Id.* at pp. 467–468.)  And in a second, related case, the tribe and some of its members sued to enjoin enforcement of a statute imposing a personal property tax on vehicles owned by tribe members living on the reservation.  (*Id.* at pp. 468–469.)

19

Citing cases barring states from directly taxing Indian-owned property or income earned by Indians on a reservation, the district court held Montana could not apply its tax on vehicles, its vendor licensing scheme, or its cigarette taxing scheme, with one significant exception: Montana "may require a pre-collection of the tax imposed by law upon the non-Indian purchaser of the cigarettes." (*Moe*, *supra*, 425 U.S. at pp. 468–469.) The high court affirmed, and the last element of its opinion—upholding the requirement of pre-collection of excise tax owed by non-tribal purchasers of cigarettes (*id.* at pp. 481–483)—is the anchor for the later decisions in *Colville, supra*, 447 U.S. 134 and *Milhelm, supra*, 512 U.S. 61 building on it.

Essentially, what the court held is that, to prevent tax evasion by non-Indians who purchase cigarettes, Montana may enlist tribal sellers in an effort to collect tax owed by these shoppers. (*Moe*, *supra*, 425 U.S. at pp. 481–483.) The court explained, "Since nonpayment of the tax is a misdemeanor as to the retail purchaser, the competitive advantage which the Indian seller doing business on tribal land enjoys over all other cigarette retailers, within and without the reservation, is dependent on the extent to which the non-Indian purchaser is willing to flout his legal obligation to pay the tax." (*Id.* at p. 482.) Noting that the burden imposed on Indian sellers "is not, strictly speaking, a tax at all" because the ultimate tax burden falls on purchasers—which is why cases invalidating direct taxation of reservation Indians did not apply—the court held that the precollection requirement was nothing more than an expedient "minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." (*Id.* at p. 483.)

*Colville* expands the core holding in *Moe* in a number of ways. The appeal there was from a district court judgment in consolidated cases, both involving cigarette sales by Indian smokeshops on reservation land in the State of Washington. (*Colville, supra,* 447 U.S. at p. 139.) One case involved the Colville, Lummi, and Makah reservations, and the other involved the Yakima reservation. (*Id.* at pp. 139, 143–144.) These tribes, like the Wiyots, had their own scheme of taxing sales of cigarettes under tribal law. (*Id.*

20

at pp. 144–145.) Washington had a tax stamp system that required precollection of an excise tax, similar to the one involved in *Moe*, but the Washington scheme went beyond Montana's by imposing on sellers detailed recordkeeping requirements. (*Colville,* at pp. 143, 151.) Also presented for decision in *Colville* were enforcement issues concerning whether Washington had the power to seize unstamped cigarettes as contraband and whether Indians living on a reservation who were not members of the reservation tribe could be taxed directly. (*Id.* at pp. 160–161.)

The holdings in *Colville* on this complex array of issues are noteworthy in three respects. First, Washington's scheme of taxing nonmembers who make on-reservation purchases was found to be valid and not preempted. (*Colville, supra,* 447 U.S. at pp. 154–155.) Here, the court observed that "the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." (*Id.* at p. 155.) "What the smokeshops offer these customers," the court said, "is solely an exemption from state taxation." (*Ibid.*) The court rejected the proposition that "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, . . . authorize Indian tribes to market an exemption from state taxation to persons who would normally do their business elsewhere." (*Ibid.*)

The tribes' reliance on their own local schemes of taxing and regulating cigarette sales failed. (*Colville, supra,* 447 U.S. at pp. 158–159.) "There is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other," the court concluded, and "the State does not interfere with the Tribes' power to regulate tribal enterprises when it simply imposes its tax on sales to nonmembers." (*Ibid.*) After weighing the federal, tribal, and state interests involved, the court found no preemption, pointing out that the "simple collection burden imposed by Washington's cigarette tax on tribal smokeshops is legally indistinguishable from the collection burden upheld in *Moe*." (*Id.* at p. 159.) For the most part, this portion of the opinion—comprising its primary holding—is a straightforward application of *Moe*; it

21

plows new ground only to the extent it upholds Washington's recordkeeping requirement, an added administrative burden on tribal sellers that was not present in *Moe*.  (*Colville,* at pp. 151, 159–160.)  The tribes had the burden of showing that the recordkeeping requirements were "not reasonably necessary as a means of preventing fraudulent transactions," and they failed to meet it.  (*Id*. at p. 160.)

Second, the court found that Washington was empowered "to apply its sales and cigarette taxes to Indians resident on the reservation but not enrolled in the governing Tribe."  (*Colville, supra,* 447 U.S. at p. 160.)  The court held that, although such persons fell within the federal statutory definition of "Indian," that fact did not demonstrate a congressional intent to exempt non-tribe members from taxation.  (*Id.* at p. 161.)  The court focused instead on whether taxing nonmembers "contravene[s] the principle of tribal self-government."  (*Ibid.*)  It did not, the court explained, "for the simple reason that nonmembers are not constituents of the governing Tribe."  (*Ibid*.)  Third, and finally, the court found Washington had "power to seize unstamped cigarettes" off-reservation, where the "state power over Indian affairs is considerably more expansive than it is within reservation boundaries."  (*Id*. at pp. 161–162.)  Having so held, however, the court declined to reach the question whether Washington "may enter onto the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell these stocks in order to obtain payment of the taxes due."  (*Id*. at p. 162.)

*Milhelm* picked up where *Moe* and *Colville* left off, but specifically addressed the wholesale level of distribution.  Historically, under federal legislation known as the Indian Trader Statutes, enacted pursuant to the Indian Commerce Clause and designed to protect against exploitation of tribes by Indian traders, and under prior Supreme Court case law, federally licensed trading agents have been exempt from state taxation, just as tribe members are exempt from state taxation.  (*Milhelm, supra,* 512 U.S. at pp. 68, 70.)  Responding to reports of huge quantities of unstamped cigarettes being shipped into Indian reservations at the wholesale level by Indian traders—volumes that were far in excess of the amounts tribe members would be expected to consume—New York

22

attempted to cut off the supply of what appeared to be a black market in untaxed cigarettes on Indian reservations by adopting regulations that imposed strict recordkeeping requirements and quantity limitations on wholesalers. (*Id.* at pp. 64–67.) The question presented was whether federal statutes governing trade with Indians preempted New York's program. (*Id.* at p. 64.)

Reviewing a decision of the New York Court of Appeals that held New York's regulations preempted by the Indian Trader Statutes, the high court framed the issue as follows. "Because New York lacks authority to tax cigarettes sold to tribal members for their own consumption, see *Moe* [*, supra*,] 425 U.S. 463, 475–481 . . . , cigarettes to be consumed on the reservation by enrolled tribal members are tax exempt and need not be stamped. On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation. See . . . *Colville* . . . 447 U.S. 134, 160–161 . . . . [¶] To ensure that nonexempt purchasers do not likewise escape taxation, the regulations limit the quantity of untaxed cigarettes that wholesalers may sell to tribes and tribal retailers." (*Milhelm*, *supra*, 512 U.S. at pp. 64–65, 68–69.)

The court reversed, extending *Moe* and *Colville* with the following explanation: "The specific kind of state tax obligation that New York's regulations are designed to enforce—which falls on non-Indian purchasers of goods that are merely retailed on a reservation—stands on a markedly different footing from a tax imposed directly on Indian traders, on enrolled tribal members or tribal organizations, or on 'value generated on the reservation by activities involving the Tribes,' *Colville,* 447 U.S., at 156–157. *Moe* [and] *Colville* . . . make clear that the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere. The 'balance of state, federal, and tribal interests,' [citation], in this area thus leaves more room for state regulation than in others. In particular, these cases have decided that

23

States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians.

"Although *Moe* and *Colville* dealt most directly with claims of interference with tribal sovereignty, the reasoning of those decisions requires rejection of the submission that [a provision of the Indian Trader Statutes] bars any and all state-imposed burdens on Indian traders. . . . [¶] . . . [¶] . . . We are persuaded . . . that New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream is a 'reasonably necessary' method of 'preventing fraudulent transactions,' one that 'polices against wholesale evasion of [New York's] own valid taxes without unnecessarily intruding on core tribal interests.' *Colville,* 447 U.S., at 160 []. The sole purpose and justification for the quotas on untaxed cigarettes is the state's legitimate interest in avoiding tax evasion by non-Indian consumers. . . . [¶] . . . [¶] . . . [And b]y requiring wholesalers to precollect taxes on, and affix stamps to, cigarettes destined for nonexempt consumers, New York has simply imposed on the wholesaler the same precollection obligation that, under *Moe* and *Colville,* may be imposed on reservation retailers." (*Milhelm*, *supra*, 512 U.S. at pp. 73–76, fns. omitted.)

24

3.     Preemption Analysis

Arguing for preemption, Huber emphasizes that this case involves solely on-reservation conduct among Indians, and, to the extent her operations extended beyond the border of the Table Bluff Rancheria, her business was with other tribes on other reservations. In her account of the facts, all she did was make wholesale deliveries to other tribes on their reservations "as a courtesy," while contractually taking and accepting every order at the only store location she had, in her house on the Table Bluff Rancheria. She insists the trial court made no finding that she conducted business off-reservation. What the trial court actually found, she says, is that her business involved extensive "off-reservation contacts," a concept she contends might be relevant to an issue of personal jurisdiction, but that has no legal significance here.

Huber relies heavily on our Supreme Court's decision in *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 520 (*Naegele*), a case involving an attempt by the California Department of Transportation to use California's Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.) to regulate billboard signage on an Indian reservation that was visible from a state highway running through the reservation. (*Naegele*, at pp. 513–514.) The *Naegele* court found this enforcement effort preempted. (*Id.* at p. 522.) If "off-reservation safety and aesthetic effects were insufficient to justify state regulation . . ." of on-reservation activities in *Naegele*, Huber argues, the off-reservation effects relied upon by the trial court are insufficient to avoid preemption here as well. This argument misses the thrust of the analysis in *Naegele*, where there was a detailed federal statutory scheme and the court found Congress did not intend to permit state regulation of billboards on Indian reservations. (*Id.* at pp. 515, 522.) The opinion thus turned on principles of federal obstacle preemption. (*Id.* at p. 522; see *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935–936 [summarizing types of federal preemption; "obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment

25

and execution of the full purposes and objectives of Congress" ' "].)  There is no pervasive federal statutory scheme here.

The Attorney General bases his argument against preemption on the general idea that Indian reservations are not legal islands unto themselves and that whatever vestiges of sovereignty they still enjoy must give way in matters of commerce affecting the welfare of state citizens outside their borders.  "Absent express federal law to the contrary," he points out, "Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."  (*Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145, 148–149 (*New Mexico I*).)  He argues there is no need to engage in *Bracker* balancing because, in his view, the claim at issue arises off-reservation.  (*Wagnon v. Prairie Band Potawatomi Nation* (2005) 546 U.S. 95, 99 (*Wagnon*) ["*Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation' "].)  To the extent Huber operated on-reservation, the Attorney General contends, much of her business was with non-tribe members who were enticed onto the Table Bluff Rancheria by her promotions.  He points out that Huber "maintained websites that advertised 'tax free' and 'cheaper cigarette[s]' and encouraged customers to 'come see us!,' sold cigarettes via mail order, and had a toll-free phone number.  [She] did not check for tribal identification and admits she sold cigarettes to the general public."

The Attorney General also draws our attention to the scale of Huber's enterprise.  What she portrays as a "small storefront" operation run out of her house is not, in fact, some tiny, exclusively on-reservation business, he points out.  Huber "sold huge quantities of noncompliant cigarettes.  Between November 23, 2009 and October 1, 2013, she sold, distributed, and transported at least 14,727,290 packs of Seneca, Opal, King Mountain, Couture, and Sands brand cigarettes to other stores within the state but beyond her reservation.  [She] invoiced over $30 million for these sales.  Several days a week her employees delivered these cigarettes using her own vehicles on state roads and highways.  Between March 8, 2007 and October 1, 2013, [Huber] also sold at least 1,969,279 packs

26

of Seneca, Opal, King Mountain, Couture, and Sands brand cigarettes at her retail store. [Huber's] tribe has about 600 members of all ages." (Fns. omitted.)

All in all, we conclude that the Attorney General has the better of the argument on the issue of preemption. While we do not agree that *Bracker* preemption analysis may be short-circuited under *Wagnon* by characterizing the conduct involved at issue as off-reservation[17]—what we have here is a mix of on-reservation and off-reservation activity—we are nonetheless persuaded that the *Bracker* test tips in favor of the People on this record. In circumstances involving conduct that is partially on-reservation and partially off-reservation, "a State may validly assert authority over the activities of nonmembers on a reservation" if a balancing of interests under *Bracke*r, *supra,* 448 U.S. 136 calls for it. (*New Mexico II*, *supra*, 462 U.S. at p. 331.) And in this balancing process, the "State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." (*Id.* at p. 336; *see Rice*, *supra*, 463 U.S. at p. 724 ["[Tribe member]'s distribution of liquor has a significant impact beyond the limits of the Pala Reservation. The state has an unquestionable interest in the liquor traffic that occurs within its borders, and this interest is independent of the authority conferred on the States by the Twenty-first Amendment"].)[18] Here in

---

[17] *Wagnon* involved an effort by the State of Kansas to impose a tax on motor fuel that was ultimately delivered to a gas station owned and operated by a Native American tribe on its reservation. (*Wagnon*, *supra*, 546 U.S. at pp. 99–101.) Because the Court was able to pinpoint *exactly* where and on whom the legal incidence of the tax fell—by state statute, the tax was imposed on the non-Indian distributor of gas, off-reservation—it was possible to say, in a binary way, that the case involved wholly off-reservation activity, so no weighing of interests was needed and the state's power to tax was not preempted. (*Id.* at pp. 102–105.) This case does not lend itself to that kind of binary analysis.

[18] See Cohen, *supra,* § 6.02[1], p. 504 ("Where activities occur partially within and partially outside Indian country, and a substantial part of the activity takes place outside, courts have generally upheld nondiscriminatory applications of state jurisdiction").

27

particular, *Moe*, *Colville,* and *Milhelm*, as cigarette sales cases, provide the framework for the appropriate balancing analysis.

A key teaching of *Moe*, *Colville,* and *Milhelm* is that the high court views the issue of state regulation of cigarette sales on Native American reservations through an economic lens, looking not only at the cost advantages of selling noncomplying cigarettes, but to the incentives to lawbreaking that such sales create and the impact of upstream purchasing in the wholesale market for illicit cigarettes. (*Moe*, *supra*, 425 U.S. at pp. 481–483; *Colville*, *supra*, 447 U.S. at pp. 154–155; *Milhelm*, *supra*, 512 U.S. at pp. 73–76.) Looking at this case in the same way, Huber's cigarette sales on the Table Bluff Rancheria in violation of the UCL, the Directory Act and the Fire Safety Act were no different in kind from the sales of non-tax stamped cigarettes at issue in *Moe*, *Colville,* and *Milhelm*; by flouting those statutes, she gained a cost advantage over retail sellers who bought at wholesale from complying manufacturers. Indeed, that cost advantage appears to have been the foundation of her enterprise, serving as an inducement to nonmembers to visit the Table Bluff Rancheria to avail themselves of prices made possible by this cost advantage, and creating a downstream market for wholesalers who distribute noncompliant cigarettes.

Huber argues that *Moe*, *Colville,* and *Milhelm* are merely "tax" cases that have no application outside the "special area of State taxation." (See *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 215, fn. 17.) We are not persuaded. What the phrase "special area" of taxation refers to is the rule that enrolled members of Native American tribes are exempt from state taxation. (*McClanahan v. Arizona State Tax Commission* (1973) 411 U.S. 164, 171 (*McClanahan*).) Huber overlooks the fact that in *Moe* the court *departs* from this "special area," and it does so because in that case the state law obligation the Native American smokeshops attacked (precollection of excise taxes) was not a tax at all, but rather was an incidental tax enforcement measure directed at ensuring collection from nonmembers (*Moe, supra,* 425 U.S. at pp. 481–483); the same was true in *Colville* (precollection and recordkeeping requirements on retailers) (*Colville,*

28

*supra,* 447 U.S. at pp. 159–160); and in *Milhelm* (recordkeeping requirements and quantity restrictions on wholesalers) (*Milhelm, supra,* 512 U.S. at pp. 64–67, 73–76). Thus, we reject Huber's argument that *Moe*, *Colville,* and *Milhelm* may be cast aside as oddball tax cases having no significance outside the specialized arena of taxation. Indeed, we view this trio of cases as integral to the entire body of Indian preemption law that has evolved over the last 50 years.

The trial court correctly concluded that the balance of federal, tribal, and state interests weighs in favor of California.[19]  Huber points to no federal interest, expressed by statute or regulation, in promoting reservation sales of cigarettes, and makes no claim that Congress, by statute or regulation, delegated to the Wiyots some form of authority that might oust the authority of the state in this area.  To the extent the Wiyot Tribe, independently, has an interest in carving out a domain for its members in the cigarette sales business—Ordinance No. 01-10 appears to evidence just such an interest—the holding in *Colville* tells us that does not matter, absent a direct conflict.  Huber insists that there is such a conflict, and that it is irreconcilable, but we do not agree.  None of the California statutes the Attorney General seeks to enforce in this case blocks Huber

[19] Huber argues that nothing in the trial court's order granting the permanent injunction or in the underlying summary adjudication order indicates that it actually engaged in the required weighing of interests under *Bracker*.  But she overlooks the procedural setting here.  There was no trial in this case, and "courts have held that a statement of decision [under Code of Civil Procedure section 632] ordinarily is not required in connection with a ruling on a motion [citations], even if the motion involves an extensive evidentiary hearing." (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 294, fn. omitted.)  Even assuming the importance of the issues at stake might have entitled her to such a statement (*Lien v. Lucky United Properties Investment, Inc.* (2008) 163 Cal.App.4th 620, 624), there is no indication in the record that she requested one, much less followed the necessary procedures to frame issues on which express findings were required in such a statement. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981– 984; Code Civ. Proc., §§ 632, 634; Cal. Rules of Court, rule 3.1590(d)–(g).) As a result, we imply all findings necessary to uphold the orders under review so long as they are supported by substantial evidence, of which there is plenty in this record to support a balancing of interests under *Bracker* in favor of the People.

outright from engaging in that which Ordinance No. 01-10 licenses her to do. Nothing in these statutes prevents her from selling tobacco products on any basis Ordinance No. 01-10 permits, solely to members of the Wiyot tribe, and solely on the Table Bluff Rancheria. California did not "impose" added burdens on her. Rather, by her choice of business strategy, she elected a path that triggered compliance obligations beyond those required by Ordinance No. 01-10.

To extent Huber wishes to sell tobacco products to non-tribe members on the Rancheria, or to ship products to customers off the Rancheria, she must comply with California law *as well as* Ordinance No. 01-10. That may make it more expensive for her to pursue the business strategy she chose, but it does not place her in a dilemma between warring legal imperatives. *Colville* is directly on point in this respect. The court there rejected an invitation to use tribal cigarette tax and marketing regulations as a consideration weighing in favor of preemption. (*Colville, supra,* 447 U.S. at pp. 158–159.) Against a nonexistent federal interest and a limited tribal interest, California has a strong health and safety interest in policing cigarette sales. In the end, therefore, we arrive at the same conclusion the courts in *People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561 (*Black Hawk*) and *Rose* did with respect to interest balancing: "The California tobacco directory law promotes public health by increasing the costs of cigarettes and discouraging smoking. [Citations.] The California Cigarette Fire Safety and Firefighter Protection Act law—providing ignition-propensity requirements—serves the public interest in reducing fires caused by cigarettes. . . . [And n]o federal or tribal interest outweighs the state's interest in . . . enforcing the California tobacco directory and cigarette fire safety laws." (*Black Hawk*, *supra*, 197 Cal.App.4th at p. 1571; see also *Rose*, 16 Cal.App.5th at p. 328 [agreeing with *Black Hawk*'s preemption balancing analysis].)

Huber argues that, by obtaining an injunction, which carries with it the threat of contempt, the enforcement steps the Attorney General has taken here—causing the shutdown of her business—go far beyond the "minimal" burdens the *Moe*, *Colville,* and

30

*Milhelm* courts approved. We cannot agree. The burden of complying with the Directory Act and the Fire Safety Act, as the Attorney General points out, falls on manufacturers. Huber's only "burden," if it can even be called that, is to choose product sourcing from manufacturers who comply with those statutes. Huber points out that the court's injunction left her no choice but to shutter her business, but if that is the case the decision to close her business rather than offer cigarettes that comply with California law was her election, apparently looking at the economics of continued operation in compliance with state law. *Colville* is quite clear that the burden was on her to show that enforcement of the Directory Act and the Fire Safety Act against her, directly and through the UCL, is "not reasonably necessary as a means of preventing fraudulent transactions." (*Colville, supra,* 447 U.S. at p. 160.) She failed to do so.

Finally, returning full circle to *Williams*, since the test for infringement of Indian sovereignty is embedded within the *Bracker* preemption test as a "backdrop" consideration (*Three Affiliated Tribes II*, *supra*, 476 U.S. at p. 884), we have held that the exercise of adjudicative jurisdiction in this case does not infringe Wiyot sovereignty. We see no such infringement in the enforcement of the injunction either. To be sure, although we agree with the balancing of interests analysis adopted in *Black Hawk* and *Rose*, and although we reach the same conclusion those courts did, we note that Huber has a stronger argument for preemption than the defendants were able to mount in *Black Hawk* and *Rose*, because here, unlike in those cases, the trial court enjoined an enrolled tribe member's business activities *on her own reservation*. That puts the issue of possible infringement of tribal self-government more sharply here than in either *Black Hawk* or *Rose*. (See *Black Hawk, supra,* 197 U.S. at pp. 1564–1565, 1566–1567; *Rose, supra,* 16 Cal.App.5th at p. 321.) Indeed, while Huber's position has shifted in the course of this appeal on the threshold question of adjudicative jurisdiction, on the issue of preemption she has been consistent throughout. As she puts it in a supplemental brief submitted following our grant of rehearing, "it is not the mere fact that adjudicatory state court jurisdiction exists or was asserted that runs afoul of *Williams*," but rather "that the

31

resulting state judicial proceedings constituted an integral part of an impermissibly invasive regulatory regime the state has sought to enforce against [her] and the Wiyot tribe in an effort to nullify tribal law and policy."

Putting aside the overstatement—the People make no attempt to enforce any laws against the Wiyot tribe itself—we are not persuaded that this case presents the "invasive" threat to "tribal law and policy" that Huber decries. She has pointed to no on-reservation enforcement activity of any kind, at least not so far. In *Colville*, the high court upheld the State of Washington's power to seize illegal cigarettes by *off-reservation* interdiction but saw no need to address whether the state had power to "enter onto the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell those stocks in order to obtain payment of the taxes due." (*Colville*, *supra*, 447 U.S. at p. 162.) The Court held the question of on-reservation seizure and sale was not presented for decision, characterizing it as "considerably different from" the issue of off-reservation interdiction. (*Ibid*.) We, too, see no need to address the question of on-reservation enforcement. And we decline to speculate about what issues might arise in hypothetical future circumstances. Although *Nevada v. Hicks*, *supra,* 533 U.S. 353, which involved the on-reservation search of a tribe member's residence in a criminal investigation for violation of a game conservation statute (*id.* at pp. 355–356), can be read to suggest that on-reservation enforcement might be permissible where the activity involved presents some risk of harm to state citizens off the reservation, it is premature to apply that case here, since any issue raised by on-reservation enforcement is not yet ripe for decision, and on that ground, we need not address it. All we need say at this point is that, to the extent enforcement occurs off-reservation, the Wiyot right to self-governance is not implicated.

## IV. DISPOSITION

Affirmed.

32

_____
Streeter, Acting P.J.

We concur:


_____
Reardon, J.[*]


_____
Smith, J.[**]


A144214/*People ex rel. v. Huber*

_____

[*] Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A144214/*People ex rel. v. Huber*

| | |
|---|---|
| Trial Court: | Humboldt County Superior Court. |
| Trial Judge: | Honorable W. Bruce Watson. |
| Counsel for Appellant: | Law Office of Dario Navarro, Dario F. Navarro; Fredericks Peebles & Morgan, Michael A. Robinson, for defendant and appellant. |
| Counsel for Respondent: | Xavier Becerra, Attorney General, Karen Leaf, Senior Assistant Attorney General, Nicholas M. Wellington, Supervising Deputy Attorney General for plaintiff and respondent. |