Filed 7/2/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> NATIVE WHOLESALE SUPPLY COMPANY, <br><br> Defendant and Appellant. | C084031, C084961 <br><br> (Super. Ct. No. 34200800014593CUCLGDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Affirmed.

Lipsitz Green Scime Cambria and Paul J. Cambria, Jr. , Erin E. McCampbell and Patrick J. Mackey for Defendant and Appellant.

Xavier Becerra, Attorney General, Karen Leaf, Senior Assistant Attorney General; Nicholas M. Wellington, Michael M. Edson, and Nora Flum Deputy Attorneys General for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

1

Defendant Native Wholesale Supply Company (NWS), an Indian-chartered corporation headquartered on a reservation in New York, sold over a billion contraband cigarettes to an Indian tribe in California, which then sold the cigarettes to the general public in California. (*People ex rel. Harris v. Native Wholesale Supply Co.* (2011) 196 Cal.App.4th 357, 362-364 (*Harris*).) The cigarettes were imported from Canada, stored at various places in the United States (not including California), and then shipped to California after they were ordered from the reservation in New York. The Attorney General succeeded on his motion for summary judgment holding NWS liable for civil penalties in violation of two California cigarette distribution and sale laws and Business and Professions Code section 17200 (the unfair competition law), and obtained a permanent injunction precluding NWS from making future sales. The Attorney General further obtained an award of attorney fees and expert expenses.

NWS appeals from the judgment and the attorney fee order. We affirm.

BACKGROUND

I

*Factual Background -- The Cigarette Sales Transactions*

The material facts are undisputed.[1] NWS is a corporation chartered under the laws of the Sac and Fox Nation of Oklahoma (Sac and Fox), a federally-recognized Indian tribe, headquartered on the Seneca Nation of Indians' (Seneca) reservation in New York.[2]

---

[1]     The trial court sustained the Attorney General's objections to the separate statement of undisputed facts, noting: "while NWS purports to dispute a number of the facts set forth in the [Attorney General's] separate statement, none of the facts are truly disputed and/or to the extent there is any dispute, it is not material." NWS does not challenge the trial court's finding in that regard.

[2]     Although immaterial to this appeal, we note NWS filed for bankruptcy in 2011; the bankruptcy court issued an order confirming NWS's bankruptcy plan in 2014. NWS's disclosure statement supporting confirmation of its bankruptcy plan reveals the bankruptcy had virtually no effect on its business: " 'The year prior to the Petition, the

2

Arthur Montour, an enrolled Seneca member, is NWS's sole owner. NWS's principal business is the sale of tobacco products produced and packaged by Grand River Enterprises Six Nations Ltd. (Grand River), a Canadian corporation located in Ontario, Canada. Grand River has never been listed on the California Attorney General's Tobacco Directory as specified in Revenue and Taxation Code section 30165.1.

NWS imported Grand River's cigarettes and stored them in rented space at one of the following three federally regulated facilities before shipping them to customers: (a) the Western New York Foreign Trade Zone in Lackawana, New York; (b) the Southern Nevada Foreign Trade Zone in Las Vegas, Nevada; or (c) a bonded warehouse located on the Seneca reservation in New York.

Between 2004 and 2012, NWS sold and shipped 98,540 cases of Grand River cigarettes (equaling more than 54.5 million cigarette packs or over a billion cigarettes) to the Big Sandy Rancheria Band of Mono Indians (Big Sandy), a small Indian tribe residing in California.[3] The sales occurred in 476 invoiced transactions, with a total value of almost $67.5 million. NWS used a customs broker located in Woodland Hills, California, to assist with some of the transactions, and paid shipping carriers headquartered in Texas, Nebraska, and New York to deliver the cigarettes.

II

*Legal Background -- The Cigarette Distribution And Sale Statutes*

To provide context for the trial court's rulings and the discussion that follows, we briefly summarize the two pertinent sets of statutes governing different aspects of the sale and distribution of cigarettes in California -- the Directory Statute (Rev. & Tax. Code,

---

annual sales were at a level of approximately $200,000,000 and it has continued at that level for the majority of the Chapter 11 administration period.' "

[3]     As of 2005, Big Sandy had approximately 434 members.

§ 30165.1) and the California Cigarette Fire Safety and Firefighter Protection Act (Fire Safety Act) (Health & Saf. Code, § 14950 et seq.).

A

*The Directory Statute*

In 1998, California and 45 other states entered into a master settlement agreement (the MSA) with the four largest American tobacco product manufacturers. (*State ex rel. Edmondson v. Native Wholesale Supply* (2010) 2010 OK 58 [237 P.3d 199, 203] (*Edmondson*); *Harris*, *supra*, 196 Cal.App.4th at p. 363; see Health & Saf. Code, § 104555, subd. (e).) The states had sued the manufacturers to recoup health care expenses incurred by the states because of cigarette smoking. (*Edmondson*, at p. 203.) "In exchange for a liability release from the states for smoking-related public healthcare costs, the settling manufacturers agreed to limit their marketing and to pay the settling states billions of dollars in perpetuity" (*Harris*, at p. 363) by making "an annual payment to each settling state computed in relation to that manufacturer's volume of cigarette sales in the state" (*Edmondson*, at p. 203).

"In order to prevent tobacco manufacturers not participating in the MSA from gaining a cost advantage over the settling manufacturers and to provide the states with a source of money from which to recover tobacco-related health care costs attributable to the sales of cigarettes by non-participating manufacturers, the MSA calls for each settling state to enact and enforce a statute (a 'qualifying statute') requiring all tobacco manufacturers not participating in the MSA who sell cigarettes in a state to make annual payments into an escrow account based on the manufacturer's relative market share in such state." (*Edmondson*, *supra*, 237 P.3d at p. 203.)

California's "qualifying statute" is commonly referred to as the Escrow Statute. It provides that cigarettes sold in this state must be produced by manufacturers who either (a) have signed the MSA, or "(b) in lieu of signing the MSA, have agreed to pay sufficient funds into a reserve fund in escrow to guarantee a source of compensation

4

should liability arise." (*People ex rel. Becerra v. Huber* (2019) 32 Cal.App.5th 524, 530.)

The Directory Statute serves as a complement to the Escrow Statute, to ensure compliance with its provisions. "Under the Directory [Statute], the Attorney General maintains a published list of all cigarette manufacturers who have annually certified their compliance with the requirements of the MSA or the alternative escrow funding requirements." (*People ex rel. Becerra v. Huber*, *supra*, 32 Cal.App.5th at p. 530; Rev. & Tax. Code, § 30165.1, subds. (b)-(c).) The Directory Statute prohibits any person from selling, offering, or possessing for sale in California, or shipping or otherwise distributing into or within California any cigarettes not listed as legal for sale on the Attorney General's directory. (Rev. & Tax. Code, § 30165.1, subd. (e)(2).) Revenue and Taxation Code section 30165.1, subdivision (e)(3) prohibits persons from selling, distributing, acquiring, holding, owning, possessing, importing, transporting, or causing to be imported, cigarettes that the person knows or should know are intended to be distributed in violation of subdivision (e)(2).

B

*The Fire Safety Act*

"[U]nder the Fire Safety Act, any manufacturer of cigarettes sold in California must meet specified testing, performance, and packaging standards established for the purpose of minimizing the fire hazards caused by cigarettes. [Citations.] This statute provides that all cigarettes sold in this state must, among other things, be packaged in a specified manner and certified with the State Fire Marshal as compliant with these safety standards. [Citation.] It is categorically illegal for any 'person' to 'sell, offer, or possess for sale in this state cigarettes' that do not comply with the Fire Safety Act." (*People ex rel. Becerra v. Huber*, *supra*, 32 Cal.App.5th at pp. 530-531.)

5

III

*Procedural Background*

The Attorney General filed a civil enforcement action against NWS in 2008, seeking an injunction, civil penalties, contempt and other relief for violations of the Directory Statute and Fire Safety Act, violation of Business and Professions Code section 17200 predicated on violations of the Directory Statute, Fire Safety Act, and a federal statute, and violation of an injunction. NWS filed a motion to remove the case to federal court, but the case was remanded back to state court for lack of federal subject matter jurisdiction.

In state court, NWS filed a motion to quash service for lack of personal jurisdiction, which culminated in our 2011 opinion concluding NWS is subject to personal jurisdiction in California for the claims asserted against it in this action. This court held that, among other things, NWS purposefully availed itself of the substantial benefits of conducting activities in California (i.e., it had minimum contacts) because the cigarettes it sold to Big Sandy were in turn sold to the general public in California. (See *Harris*, *supra*, 196 Cal.App.4th at pp. 360, 362-365.) NWS then filed a demurrer to all the causes of action. The trial court sustained the demurrer with respect to the injunction violation cause of action and overruled it with respect to the remaining causes of action.

The parties subsequently engaged in discovery, resulting in several motions and rulings, five of which are the subject of this appeal. Those motions and rulings are discussed in greater detail in the pertinent Discussion section below.

In August 2016, the Attorney General and NWS filed their respective motions for summary judgment. The Attorney General argued NWS did not dispute the essential facts supporting the causes of action. NWS argued: (1) the Indian Commerce Clause preempted the claims against NWS because the "transactions occurred on a reservation solely among various Indian-owned entities"; and (2) injunctive relief would be

6

unnecessary and ineffectual because NWS is a bankrupt entity and voluntarily discontinued selling cigarettes within California in 2012.

NWS raised the same preemption and injunctive relief arguments in its opposition to the Attorney General's motion for summary judgment, and further argued: (1) the trial court lacked personal jurisdiction over NWS for the claims presented; (2) the Directory Statute violated NWS's equal protection rights; (3) NWS "was under no legal obligation to comply with the mandates of the Directory and Escrow Statutes at the time of the cigarettes sales at issue in this case (i.e. 2004-2012)" because the statutes did not apply to NWS until 2013; and (4) the calculation of civil penalties was too speculative for summary judgment because the Attorney General submitted no proof of the quantity of cigarettes sold to non-Indian customers and could not seek penalties for cigarettes sold to Indian customers.

The trial court granted the Attorney General's motion and denied NWS's motion, finding none of NWS's defenses availing and no triable issues of material fact relating to the alleged violations.

The trial court found the Attorney General provided sufficient evidence to establish Directory Statute violations by "demonstrat[ing] that NWS sold in and shipped or otherwise distributed into California cigarettes that were not listed on the Attorney General's directory in violation of subdivision (e)(2)" and "that NWS knew or should have known that Big Sandy intended to redistribute the cigarettes in violation of subdivision (e)(2), which constitutes a violation of subdivision (e)(3)." The Attorney General "met [his] burden to shift to NWS the burden on demonstrating the existence of a triable issue of material fact. It failed to do so."

The trial court further found the Attorney General provided sufficient evidence to establish Fire Safety Act violations by "show[ing] that NWS sold cigarettes to Big Sandy for which no certification had been filed between July 9, 2008, when it was served with the complaint in this action, and May 25, 2012, when it claimed to have stopped selling

7

the cigarettes. [Citations.] At no time prior to February 2014 were any [Grand River]-Cigarettes certified as being in compliance with Health & Safety Code section 14951, subdivision (a)(4). [Citations.] The evidence [wa]s sufficient to shift to NWS the burden of demonstrating the existence of a triable issue of material fact." NWS again failed to carry its burden.

Finally, the trial court found the Attorney General proved NWS's violation of Business and Professions Code section 17200 through the violations of the Directory Statute and Fire Safety Act, and violation of a federal cigarette interstate commerce statute (15 U.S.C., § 376), which required NWS to file monthly reports with the state tax administrator, providing specific information about each shipment. "The evidence show[ed] that NWS, headquartered in New York, sold and shipped cigarettes from outside California to Big Sandy in California, which is not a licensed distributor in California, thus engaging in interstate commerce. [Citations.] NWS failed to file monthly reports with the state tax administrator. [Citation.] The evidence [wa]s sufficient to shift to NWS the burden of demonstrating the existence of a triable issue of material fact." NWS failed to carry its burden.

Given that there were no disputed factual issues regarding remedies, the trial court granted the Attorney General's request for civil penalties in the amount of $4,292,500, and his request for an injunction.

The Attorney General subsequently moved for attorney fees. The court granted that motion and awarded $3,843,981.25 in attorney fees and $9,119.25 in expert expenses, for a total of $3,853,100.50. We discuss the specifics relating to the attorney fee order in the pertinent Discussion section below.

NWS appeals from the trial court's judgment in favor of the Attorney General and the order granting the Attorney General's request for attorney fees.

8

DISCUSSION

I

*Summary Judgment*

Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the grant and denial of summary judgment motions de novo. (*Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1092.) We independently examine the record and evaluate the correctness of the trial court's ruling, not its rationale, and must affirm the order if it reaches the correct result under any legal theory. (*Moore v. William Jessup University* (2015) 243 Cal.App.4th 427, 433.) Here, the material facts are undisputed, raising only questions of law.

A

*Personal Jurisdiction*

NWS challenges the trial court's refusal to relitigate the issue of personal jurisdiction, raised as a defense to the Attorney General's motion for summary judgment. The trial court declined to consider the defense because the issue had been extensively litigated earlier in the proceedings and, on appeal in 2011, we concluded NWS is subject to specific personal jurisdiction in this case because "NWS has purposefully derived benefit from California activities under the stream of commerce theory." (*Harris*, *supra*, 196 Cal.App.4th at p. 360.) NWS argues we should reconsider our 2011 decision in light of *Walden* or *Bristol-Myers*, cases decided by the United States Supreme Court after 2011. We disagree.

Neither of those cases demands a different result or requires us to revisit jurisdiction. As we explained in the 2011 opinion, NWS is subject to personal jurisdiction under the stream of commerce theory -- a theory of personal jurisdiction neither addressed nor applied in *Walden* or *Bristol-Myers*. (*Walden v. Fiore* (2014) 571 U.S. 277 [188 L.Ed.2d 12]; *Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S.

9

__ [198 L.Ed.2d 395].)  More importantly, the facts in those cases are highly distinguishable.  (*Walden*, at p. 291 [188 L.Ed.2d at p. 24] [where the "relevant conduct occurred entirely in Georgia . . . the mere fact that [the] conduct affected plaintiffs with connections to [Nevada] d[id] not suffice to authorize [personal] jurisdiction" over the defendant in Nevada]; *Bristol-Myers Squibb Co.*, at p. __ [198 L.Ed.2d at pp. 404-405] [no personal jurisdiction over drug manufacturer in California where nonresidents were not prescribed the drug in California, did not purchase or ingest the drug in California, and were not injured by the drug in California, and the fact that other plaintiffs were prescribed, obtained, and ingested the drug in California -- and allegedly sustained the same injuries as the nonresidents -- did not warrant specific jurisdiction over the nonresidents' claims].)

Whereas a connection between the forum and the specific claims against the defendants was lacking in *Walden* and *Bristol-Myers*, here we held NWS had substantial contacts with California.  As this court previously explained, NWS sold millions of cigarettes to Big Sandy, a tribe with only 431 members, and the cigarettes were in turn sold to the general public.  (*Harris*, *supra*, 196 Cal.App.4th at pp. 363-364.)  "Placing goods in the stream of commerce with the expectation that they eventually will be purchased by consumers in the forum state indicates an intention to serve that market and constitutes purposeful availment" where, as in this case, the income earned by NWS was substantial.  (*Harris*, at p. 364.)

The trial court also did not err in declining to relitigate the issue of personal jurisdiction.  The law of the case doctrine cemented our 2011 personal jurisdiction decision, rendering it binding on the trial court and in this appeal.  " ' "The doctrine of the law of the case is this:  That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . and this

10

although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 786.)

Our 2011 opinion stands; NWS is subject to personal jurisdiction for the claims asserted against it in this litigation.

## B

### *Indian Commerce Clause Preemption*

Distilled to its essence, NWS argues the Attorney General's claims are preempted because the Indian Commerce Clause precludes application of state laws (such as the Directory Statute and the Fire Safety Act) to on-reservation transactions between Indians (which NWS believes is the nature of the transactions at issue in this case). This is not the first time NWS has raised this argument in a state enforcement action relating to the sale of contraband cigarettes. Indeed, both the Oklahoma and Idaho Supreme Courts have considered and rejected NWS's preemption defense in analogous enforcement actions under similar circumstances. (*Edmondson*, *supra*, 237 P.3d 199; *State ex rel. Wasden v. Native Wholesale Supply Co.* (2013) 155 Idaho 337 [312 P.3d 1257] (*Wasden*).)

### 1

### *The Guiding Principles*

"Indian tribes do not have an automatic exemption from state law." (*Confederated Tribes of Siletz Indians v. Oregon* (9th Cir. 1998) 143 F.3d 481, 486.) " '[There] is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members.' " (*People v. McCovey* (1984) 36 Cal.3d 517, 524.) However, generally, "[s]tate jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state

authority." (*New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 334 [76 L.Ed.2d 611, 620].)

"Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3.[4] [Citation.] This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations.] Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' [Citations.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop,' [citation], against which vague or ambiguous federal enactments must always be measured.

"The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other. The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law. [Citation.] As we have repeatedly recognized, this tradition is reflected and encouraged

---

**4** The Indian Commerce Clause provides: "The Congress shall have power . . . [t]o regulate commerce . . . with the Indian tribes." (U.S. Const., art. I, § 8, cl. 3.)

in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.  Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.  [Citation.] We have thus rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required.  [Citation.]  At the same time any applicable regulatory interest of the State must be given weight, [citation], and 'automatic exemptions "as a matter of constitutional law" ' are unusual.  [Citation.]

"When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.  [Citations.] More difficult questions arise where . . . a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.  In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.  This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law."[5]  (*White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136, 142-145 [65 L.Ed.2d 665, 672-673], fns. omitted (*Bracker*).)

---

[5]     NWS asserts this paragraph in *Bracker* delineates two preemption analyses:  (1) a per se rule of preemption if the state seeks to regulate on-reservation transactions between tribal members; and (2) a balancing-of-the-interest test when the state seeks to regulate on-reservation transactions between tribal members and nontribal members.  We disagree.  As the Attorney General explains:  "Read in context, and paying attention to

13

2

*The Oklahoma And Idaho Supreme Court Decisions*

a

*Oklahoma*

Oklahoma sued NWS for violation of that state's statute analogous to the Directory Statute, called the Master Settlement Agreement Complementary Act (OK Complementary Act).[6] (*Edmondson*, *supra*, 237 P.3d at pp. 203-204.) NWS purchased the cigarettes in Canada, stored them "in several locations in the United States, including the Free Trade Zone in Las Vegas, Nevada," and sold the cigarettes to a tribal entity known as Muscogee Creek Nation Wholesale in Oklahoma. (*Id.* at pp. 207-208.)

The Oklahoma Supreme Court considered the doctrine of tribal immunity to determine if the state had a remedy against NWS for violation of the OK Complementary Act and preemption under the Indian Commerce Clause to determine whether the state

---

language NWS ignores, the half-sentence NWS relies on is just part of an example of application of the balancing test, not a separate, *per se*, rule: 'When on-reservation conduct involving only Indians is at issue, state law is *generally* [not always, as NWS contends] inapplicable, *for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.*' " The United States Supreme Court has also expressly rejected the idea of a per se rule, except "[i]n the special area of state taxation of Indian tribes and tribal members." (*California v. Cabazon Band of Indians* (1987) 480 U.S. 202, 214-215 & fn. 17 [94 L.Ed.2d 244, 258-259].)

[6] The legislation "obligates all tobacco product manufacturers whose products are sold in Oklahoma to provide the Attorney General's office with an annual certification that the manufacturer has either signed on to participate in the MSA or is fully compliant with the qualifying statute's escrow requirement" and "makes it unlawful for any person to 'sell or distribute . . . or acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the State in violation of the Complementary Act.' " (*Edmondson*, *supra*, 237 P.3d at pp. 203, 204.)

had a right to enforce NWS's noncompliance with state law. (*Edmondson*, *supra*, 237 P.3d at pp. 209-210.) The court found neither tribal immunity nor preemption applied.

With respect to the preemption analysis, NWS argued "that transactions between Native Americans -- 'tribal to tribal transactions' -- are beyond the reach of state regulatory power." (*Edmondson*, *supra*, 237 P.3d at p. 215.) The court disagreed, explaining: "While Native Wholesale Supply does not say so expressly, it seems to be arguing that there is a dormant or negative aspect to the Indian Commerce Clause analogous to that found in the Interstate Commerce Clause. By granting to Congress the power to regulate Indian commerce, [NWS] implies, the Indian Commerce Clause forbids states to regulate such commerce. We see no support for such an interpretation of the Indian Commerce Clause in the jurisprudence of the United States Supreme Court, whose decisions clearly establish that the Indian Commerce Clause does not 'of its own force' automatically bar all state regulation of Indian commerce. Rather, each state assertion of authority over tribal land and tribal members must be examined in light of the Indian sovereignty principles developed by the Supreme Court for conformity to federal law." (*Ibid*., fn. omitted.)

The court continued: "Even accepting for the sake of argument that Native Wholesale Supply's transactions with Muscogee Creek Nation Wholesale take place on the Seneca Cattaraugus Indian Territory in New York because the business is located and accepts orders there, [NWS's] argument that enforcement of the [OK] Complementary Act against it violates the Indian Commerce Clause is clearly wrong. There is no blanket ban on state regulation of inter-tribal commerce even on a reservation. The Supreme Court has ruled precisely on that point by allowing state taxation of retail sales made on-reservation by tribal retailers to Native Americans who are not members of the governing tribe. The transactions at issue in this case are between a Sac and Fox chartered corporation operating on the tribal land of another tribe with a third tribe, the Muscogee Creek Nation. Such transactions are not beyond the reach of state authority.

15

"In reality, Native Wholesale Supply's transactions with Muscogee Creek Nation Wholesale extend beyond the boundaries of any single 'reservation.' The cigarettes at issue are manufactured in Canada, shipped into the United States, and stored in a Free Trade Zone in Nevada. Muscogee Creek Nation Wholesale places orders for cigarettes from its 'reservation' located within the territorial boundaries of this State to Native Wholesale Supply at the latter's principal place of business on another 'reservation' in another State. Delivery of the cigarettes to Muscogee Creek Nation Wholesale requires shipment of the cigarettes from Nevada to the purchaser's tribal land in Oklahoma. The entire process comprising these sales thus takes place in multiple locations both on and off different tribal lands. This is not on-reservation conduct for purposes of Indian Commerce Clause jurisprudence, but rather off-reservation conduct by members of different tribes. Therefore, Oklahoma's enforcement of the [OK] Complementary Act against Native Wholesale Supply passes muster without even evaluating it under the *Bracker* interest balancing test. 'Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State.' The [OK] Complementary Act is a law of general application and there is no evidence that it is applied to Native-American cigarette wholesalers in a discriminatory manner." (*Edmondson*, *supra*, 237 P.3d at pp. 215-216, fn. omitted.)

The court further concluded "the State's interest in enforcing the MSA through the [OK] Complementary Act would outweigh any interest the tribe or federal government might have in prohibiting its enforcement against Native Wholesale Supply." (*Edmondson*, *supra*, 237 P.3d at p. 216.)

b

*Idaho*

Idaho sued NWS seeking a permanent injunction and civil penalties for, in part, violation of that state's statute analogous to the Directory Act, also called the

16

Complementary Act (ID Complementary Act).**7** (*Wasden*, *supra*, 312 P.3d at pp. 1259-1260.) NWS had sold over 100 million noncompliant cigarettes wholesale to Warpath, an Idaho corporation owned by a member of the Coeur d'Alene tribe and operated solely on the tribe's reservation. (*Id*. at p. 1259.) As in this case, NWS purchased the cigarettes in Canada and stored them "in a foreign trade zone in Nevada." (*Id*. at pp. 1259-1260.) The cigarettes were shipped from Nevada to the Coeur d'Alene tribe's reservation. (*Id*. at p. 1260.) The state obtained an injunction prohibiting NWS from selling noncompliant cigarettes and was awarded $214,200 in civil penalties. (*Ibid*.)

NWS appealed, asserting as one of the bases for the appeal that "because it is owned by a tribal member and it operates on an Indian reservation, the State lacks subject matter jurisdiction to regulate its transactions with Warpath." (*Wasden*, *supra*, 312 P.3d at p. 1261.) The Idaho Supreme Court disagreed. Relying on a federal district court case, the Idaho Supreme Court said: "A 'corporation is not an Indian for purposes of immunity from state taxation.' " (*Id.* at p. 1262.) The court continued: "there is no indication that the corporation is acting as a surrogate for the tribe itself. There is nothing to suggest that it is controlled by the tribe or operated for tribal governmental purposes. The fact that NWS is operated on a different reservation than the one under which it is organized suggests that it is not connected to tribal business. Thus, we hold that, as a corporation, NWS is not an Indian." (*Ibid*.)

NWS also argued "that even if it is found not to be an Indian, the Indian Commerce Clause prevents the State from regulating its transactions with Warpath because it is selling cigarettes strictly to a reservation-based retailer. When a state desires

---

**7** The ID Complementary Act "requires every tobacco manufacturer that sells cigarettes in Idaho to annually certify compliance with the requirements of the [MSA]. The State of Idaho maintains a registry of such compliant manufacturers. It is unlawful to sell cigarettes from a non-compliant manufacturer within the state of Idaho." (*Wasden*, *supra*, 312 P.3d at p. 1259.)

to regulate non-Indians inside Indian Country, the U.S. Supreme Court has employed a balancing test to determine whether the state's authority has been preempted by federal law." (*Wasden*, *supra*, 312 P.3d at p. 1262.)  The Idaho Supreme Court agreed with the district court's finding that "NWS's activities occurred off reservation and the *Bracker* balancing test was not applicable." (*Id.* at p. 1263.)  The court explained:

" 'Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State.' [Citations.]  In other words, whether a member of a tribe or not, when a person operates outside of reservation boundaries, the *Bracker* test does not apply.  For this reason, tribal members operating outside reservation boundaries have been subject to state regulation. [Citations.] [¶]  Thus, the location of the activity can be an important factor in analyzing state regulation where Indian commerce is implicated.  Here, however, the activity is not occurring strictly on the reservation.  We decline NWS's invitation to characterize the activity as merely the sale of cigarettes to Warpath on the Coeur d'Alene reservation.  NWS's activities are far broader than just sales to Warpath.  The activity at issue here extends beyond the borders of the reservation.  Looking at NWS's activity as a whole, it cannot be characterized as an on-reservation activity.  NWS is operated on the Seneca reservation in New York, but is organized under the laws of a separate tribe.  It purchases cigarettes that are manufactured in Canada.  It stores those cigarettes in a foreign trade zone in Nevada.  It then ships those cigarettes from Nevada into Idaho.  NWS's activities in this case are not limited to a single reservation, or even several reservations.  Thus, we hold that NWS's importation of non-compliant cigarettes into Idaho is an off-reservation activity and is therefore not subject to a *Bracker* analysis." (*Wasden*, *supra*, 312 P.3d at p. 1263, fn. omitted.)

18

## 3

### *The Indian Commerce Clause Is Inapplicable*

NWS argues it qualifies as an "Indian" for purposes of the Indian Commerce Clause analysis in two ways: (1) by regulation under California law because it is an Indian-owned corporation; and (2) derivatively through its owner's tribal member status based on United States Supreme Court precedent. We disagree.

The California regulation upon which NWS relies exempts "Indians," as the term is defined therein, from certain sales and use tax obligations. (Cal. Code Regs., tit. 18, § 1616, subd. (d).) The term "Indian" is defined to include "corporations organized under tribal authority and wholly owned by Indians."[8] (*Ibid.*)

The regulation has no application here. In the Revenue and Taxation Code, the statutes governing the "Sales and Use Tax" and the "Cigarette Tax" are located in separate parts of the code (see Rev. & Tax. Code, §§ 6001 et seq. [Part 1 -- sales and use taxes], 30001 et seq. [Part 13 -- cigarette tax]), and have been implemented through distinct sets of regulations in different chapters of the California Code of Regulations (see Cal. Code Regs., tit. 18, §§ 1500 et seq. [sales and use tax regulations], 4001 et seq. [cigarette tax regulations]). The Directory Statute is located within the Cigarette Tax part of the code, and none of the statutes contained therein nor the implementing regulations relating thereto contain a provision like the one upon which NWS relies. The Fire Safety Act is even further removed from the regulation because it is located in the Health and Safety Code not the Revenue and Taxation Code. We find no indication from the

---

[8] NWS does not argue (nor is there any evidence to suggest) that the corporation is an arm of a tribal government and, therefore, immune from suit. (See *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 247-248 [" 'Although [Indian tribal] immunity extends to entities that are arms of the tribes, it apparently does not cover tribally chartered corporations that are completely independent of the tribe' "]; cf., e.g., *Allen v. Gold Country Casino* (9th Cir. 2006) 464 F.3d 1044, 1046-1047 [casino considered arm of the tribe].)

language in the sales and use tax statutes or regulations that the definition of "Indian" under California Code of Regulations, title 18, section 1616, subdivision (d) was intended to apply in any context other than the sales and use tax exemptions at issue in that provision.

The United States Supreme Court's *Hobby Lobby* opinion does not bring NWS within the ambit of the Indian Commerce Clause either. (*Burwell v. Hobby Lobby Stores, Inc.* (2014) 573 U.S. __ [189 L.Ed.2d 675].) NWS argues *Hobby Lobby* supports the conclusion that "closely held corporations, like NWS, take on the constitutionally enshrined rights of their owners." It believes the case "makes it clear that Arthur Montour, an Indian, was not divested of his status as an Indian simply because he elected to incorporate, rather than operate as a sole proprietorship." Thus, NWS seeks to cloak itself in tribal membership status derivatively through Montour's Seneca tribal membership. A reading of *Hobby Lobby* makes clear, however, that NWS's argument finds no footing in the text of the opinion.[9]

*Hobby Lobby* dealt with the interpretation and application of a specific statute, the Religious Freedom Restoration Act of 1993 (RFRA). The United States Supreme Court considered whether a federal agency could, pursuant to RFRA, "demand that three closely held corporations provide health-insurance coverage for methods of contraception

---

[9]  We note that even if NWS could cloak itself in Montour's tribal membership, it would not transform the transactions with Big Sandy into "Indian-to-Indian" transactions, as NWS claims. That is because there is no constitutional or statutory right afforded to an Indian of one tribe (such as Montour) to conduct business free from state regulation with an Indian of a different tribe (such as a member of Big Sandy) under the Indian Commerce Clause. (*People ex rel. Becerra v. Rose* (2017) 16 Cal.App.5th 317, 329 [nonmember Indians (i.e., Indians who are not members of the governing tribe) stand on the same footing as non-Indians for purposes of the Indian commerce clause]; *Rice v. Rehner* (1983) 463 U.S. 713, 720, fn. 7 [77 L.Ed.2d 961, 971] ["Indians resident on the reservation but nonmembers of the governing tribe 'stand on the same footing as non-Indians resident on the reservation' insofar as [state regulation] is concerned"].)

20

that violate the sincerely held religious beliefs of the companies' owners." (*Burwell v. Hobby Lobby Stores, Inc.*, *supra*, 573 U.S. at p. __ [189 L.Ed.2d at p. 686].)  The court found it could not -- "the regulations that impose[d] this obligation violate[d] RFRA, which prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest."  (*Ibid*.)

The court rejected the federal agency's argument that "the owners of the companies forfeited all RFRA protection when they decided to organize their businesses as corporations rather than sole proprietorships or general partnerships" based on its reading of the statute.  (*Burwell v. Hobby Lobby Stores, Inc.*, *supra*, 573 U.S. at p. __ [189 L.Ed.2d at p. 686].)  The court explained:  "RFRA applies to 'a person's' exercise of religion, [citations], and RFRA itself does not define the term 'person.'  We therefore look to the Dictionary Act, which we must consult '[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise.'  [Citation.]  [¶]  Under the Dictionary Act, 'the wor[d] "person" . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'  [Citations.]  Thus, unless there is something about the RFRA context that 'indicates otherwise,' the Dictionary Act provides a quick, clear, and affirmative answer to the question whether the companies involved in these cases may be heard."  (*Id.* at p. __ [189 L.Ed.2d at p. 696].)  The court concluded "[t]he plain terms of RFRA make it perfectly clear that Congress did not discriminate in this way against men and women who wish to run their businesses as for-profit corporations in the manner required by their religious beliefs."  (*Id.* at p. __ [189 L.Ed.2d at p. 686].)

The United States Supreme Court did not consider or discuss the extension of any protections from a company's owners to the corporation outside the context of RFRA.  More specifically, the Indian Commerce Clause does not contain the word "person" as defined by the Dictionary Act or as discussed in *Hobby Lobby*.  NWS points us to no

21

federal statute, nor are we aware of any, that includes a corporation within the definition of Indian, tribe, or tribal member. Thus, *Hobby Lobby* is wholly irrelevant to the issue at hand.

NWS has provided no legitimate basis for concluding it qualifies as a tribal member. It is thus considered a non-Indian for purposes of the Indian Commerce Clause analysis.

NWS's non-Indian status does not, however, dispose of the preemption defense. If the liability-creating conduct occurred on-reservation, we must further conduct a balancing-of-the-interest analysis as provided in *Bracker*. (*Bracker*, *supra*, 448 U.S. at pp. 144-145 [65 L.Ed.2d at p. 673].) On the other hand, if the liability-creating conduct occurred off-reservation, no such analysis is necessary and we may conclude the Indian Commerce Clause does not apply. We therefore next consider the geographical reach of the transactions as applied under the Directory Statute and the Fire Safety Act.

The United States Supreme Court "has repeatedly emphasized that there is a significant geographical component to tribal sovereignty" in determining whether state authority has exceeded the permissible limits. (*Bracker*, *supra*, 448 U.S. at p. 151 [65 L.Ed.2d at p. 677]; *Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145, 148-149 [36 L.Ed.2d 114, 119] ["Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State"].) To determine whether a transaction is off-reservation or on-reservation for purposes of analyzing the applicability of the Indian Commerce Clause, we must determine where the party bearing the legal incidence of the regulation conducted the liability-creating conduct. (See *Wagnon v. Prairie Band Potawatomi* (2005) 546 U.S. 95, 105-110 [163 L.Ed.2d 429, 439-442].)

We agree with the Oklahoma and Idaho Supreme Courts that the Indian Commerce Clause was not intended to cloak in sovereignty the type of transactions at issue here. (*Edmondson*, *supra*, 237 P.3d at pp. 215-216; *Wasden*, *supra*, 312 P.3d at p.

22

1263.)  Like NWS's transactions in violation of the OK Complementary Act in *Edmondson* and the ID Complementary Act in *Wasden* -- statutes analogous to the Directory Act -- NWS's activity in this case involved violations of the Directory Act occurring off-reservation.  (See *ibid*.)

Revenue and Taxation Code section 30165.1, subdivision (e)(2) provides that a corporation shall not ship or otherwise distribute contraband cigarettes *into* or *within* California (irrespective of where the cigarettes were ultimately sold), and subdivision (e)(3) provides that a corporation shall not transport, import, or cause to be imported cigarettes knowing the cigarettes are intended to be distributed in violation of subdivision (e)(2).  (See also Rev. & Tax. Code, § 30010.)  Here, NWS arranged for the transport of millions of contraband cigarettes to Big Sandy in California.  (*Harris*, *supra*, 196 Cal.App.4th at p. 362.)  NWS does not dispute the trial court's factual finding that NWS had the requisite knowledge, and there is no evidence that the contraband cigarettes somehow avoided passing through California.

Thus, the legal incidence of the penalties and liability under the Directory Statute attached before the contraband cigarettes reached Big Sandy's reservation -- while the cigarettes were on their way to their final destination and after they breached the California border.[10]  Under such circumstances, the *Bracker* test is inapplicable.[11]  (See

---

[10]    The trial court noted:  "NWS attempts to dispute almost all of the [Attorney General's] material facts with evidence that it sold cigarettes to Big Sandy, a federally recognized tribe, on sovereign land, in transactions that were [freight on board] New York with title and risk of loss transferring to Big Sandy before the products entered into California."  The trial court disregarded the argument because it "ha[d] sustained the [Attorney General's] objections to the evidence on this point."  NWS does not challenge the trial court's finding in that regard.

[11]    *Black Hawk* is of no assistance to NWS.  NWS asserts "*Black Hawk* recognized that Black Hawk, a company owned by an enrolled member of the Sac and Fox Nation, a federally-recognized Indian tribe from Oklahoma, was legally permitted to sell off-directory cigarettes to any federally-recognized tribe of California.  As such, NWS, a

23

*Wagnon v. Prairie Band Potawatomi Nation*, *supra*, 546 U.S. at p. 113 [163 L.Ed.2d at p. 444] ["If a State may apply a nondiscriminatory tax to Indians who have gone beyond the boundaries of a reservation, then it follows that it may apply a nondiscriminatory tax where, as here, the tax is imposed on non-Indians as a result of an off-reservation transaction. In these circumstances, the interest-balancing test set forth in *Bracker* is inapplicable"].)

The location of the conduct to which the Fire and Safety Act liability attaches is not as clear; but, as we explain, preemption nonetheless does not apply. Health and Safety Code section 14955, subdivision (a) provides: "A manufacturer or any other person or entity that knowingly sells or offers to sell cigarettes other than through retail sale in violation of this part is subject to a civil penalty not to exceed ten thousand dollars ($10,000) for each sale."[12] "Sale" is defined as "any transfer, exchange, or barter, in any manner or by any means whatever, or any agreement for these purposes." (Health & Saf. Code, § 14950, subd. (b)(10).) Whether the sales of the contraband cigarettes occurred on the Seneca reservation, the Big Sandy reservation, or somewhere in between is immaterial to the outcome of this case. That is because California's interests in regulating the conduct at issue are sufficient to justify the assertion of state authority under the *Bracker* balancing-of-the-interests test in any event.

---

company chartered under the laws of the Sac and Fox Nation of Oklahoma, and owned by an enrolled member of the Seneca Nation of Indians, should not have been penalized by the lower court for selling off-directory cigarettes to Big Sandy Rancheria, a federally-recognized tribe located within California." However, NWS relies on a paragraph in the "Factual and Procedural Background" of the opinion, which merely recites the trial court's preliminary injunction ruling. (*People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561, 1566-1567.) The appellate court neither considered nor endorsed the propriety of the preliminary injunction's language, and the opinion contains no discussion in that regard. A decision is not authority for propositions not considered. (*McDowell & Craig v. City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38.)

[12]    The trial court noted: "NWS has admitted that the sales were not retail sales."

" 'The California Cigarette Fire Safety and Firefighter Protection Act -- providing ignition-propensity requirements -- serves the public interest in reducing fires caused by cigarettes. . . . [And n]o federal or tribal interest outweighs the state's interest in . . . enforcing the California tobacco directory and cigarette fire safety laws.' " (*People ex rel. Becerra v. Huber*, *supra*, 32 Cal.App.5th at pp. 549-550, agreeing with *People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561 & *People ex rel. Becerra v. Rose*, *supra*, 16 Cal.App.5th at p. 328; see also *Washington v. Confederated Tribes of the Colville Reservation* (1980) 447 U.S. 134 [65 L.Ed.2d 10] [state may regulate on-reservation cigarettes sales between tribal members and nonmembers].)

We need not address the geography of the liability-creating conduct for purposes of Business and Professions Code section 17200 because the cause of action is predicated on violations of the Directory Statute, Fire Safety Act, and a federal statute. We have already determined the Directory Statute and the Fire Safety Act are not preempted under the Indian Commerce Clause, and the federal statute is not subject to the preemption analysis.

C

*Equal Protection*

The equal protection clause of the Fourteenth Amendment directs no state shall "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) It generally requires the government to treat similarly situated people alike. (*Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 320].) In opposition to the Attorney General's motion for summary judgment, NWS argued the Directory Statute violates the equal protection clause based on race discrimination and genuine issues of material fact existed regarding the legislative intent behind the statute's enactment. As explained *ante*, we review the trial court's denial of this defense de novo.

25

Our review rests on the resolution of one pivotal question: Is the corporation considered an "Indian"? That is because NWS's defense is grounded in the singular argument that the Directory Statute "impacts or singles out an identifiable group of people for particular or special treatment, in this case, Indians," like NWS.[13] The decisiveness of this question hails from the fundamental premise that a charge of unconstitutional discrimination can only be raised by the person or a member of the class of persons discriminated against. (*Rubio v. Superior Court* (1979) 24 Cal.3d 93, 103.) The limited exception to this rule in cases where no member of the class would ever be in a position to complain of the discrimination is not at issue here. (*Ibid.*)

As we explained *ante*, neither California Code of Regulations section 1616, title 18, subdivision (d) nor *Hobby Lobby* supports the conclusion that NWS is an Indian. NWS raises no alternate argument in support of its equal protection defense. Accordingly, NWS's equal protection defense fails for lack of standing and we need not address the merits.

## II

### *The Discovery Orders*

NWS challenges five discovery rulings in which the trial court denied its motions to compel further responses and production of documents by the Attorney General and granted motions for protective orders and to quash a nonparty deposition subpoena relating to discovery propounded by NWS. A trial court's discovery rulings are reviewed

---

[13]    Although NWS's equal protection defense in its verified answer stated, "[t]he state laws on which each and every cause of action alleged in the Complaint is based, and the Master Settlement Agreement from which the state's tobacco directory law [citation] derives, impermissibly discriminate against Indian tribal members, Indian tribes, Native cigarette manufacturers, and entities that sell or desire to sell Native-made cigarettes to Indian tribal members or Indian tribes, or both," NWS's opposition to the motion for summary judgment on the ground of equal protection was based *solely* on the Directory Act as applied to NWS, as an Indian.

26

for abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733.) Further, as we explained in *Lickter*, when a party does not seek writ review of the trial court's discovery rulings and instead appeals from a judgment to obtain review of those discovery orders, the party must also show the error was prejudicial; i.e., the party must show that it is reasonably probable the outcome would have been more favorable to the party had the trial court not erred in the discovery rulings. (*Lickter v. Lickter* (2010) 189 Cal.App.4th 712, 740; accord *MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045.) NWS has the burden to make an affirmative showing that the erroneous discovery ruling resulted in a miscarriage of justice. (*MacQuiddy*, at p. 1045; *Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP* (2012) 212 Cal.App.4th 1181, 1197-1198.)

Here, we need not delve into the substance of the discovery rulings or decide whether the rulings were an abuse of discretion because, even assuming they were, NWS has failed to demonstrate it is reasonably probable the outcome of the motions for summary judgment would have been more favorable to it had the trial court ruled in its favor on the discovery motions. (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532-533 [appellant bears burden to make affirmative showing the trial court committed error and that error resulted in a miscarriage of justice].) Indeed, NWS does not even attempt to make this showing, arguing instead that it "is not required to establish that it was prejudiced by the lower court's discovery rulings" because "[p]rejudice need only be found in instances where a party is appealing a final judgment made pursuant to a court error which occurred *during trial* - not in appeals of discovery motions." NWS fails to provide any clarification for this statement and cites no authority for this proposition either; and, in any event, it is plainly wrong in light of this court's established legal precedent. NWS did not seek writ review of the discovery orders and now seeks to attack those orders on appeal from a judgment against it. Therefore, it is required to show prejudice. (*Lickter v. Lickter*, *supra*, 189 Cal.App.4th at p. 740.)

27

"[W]e cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice. [Citations.] Nor will this court act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) Because there is no showing of prejudicial error, we affirm the trial court's discovery rulings.

III

*The Motion For Attorney Fees*

A

*The Order Generally*

The Attorney General sought $4,017,708.75 in attorney fees, representing 9,174.74 hours of legal work in this matter.[14] The trial court applied the lodestar method to determine the appropriate amount of the attorney fee award.

Under the lodestar method, attorney fees are calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate prevailing in the community for similar work. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*Ibid*.)

In its order, the trial court described the case as follows: "This case has a long protracted history involving removal to and remand from Federal Court, extensive litigation related to the issue of whether personal jurisdiction existed over NWS including appeals to the Third District Court of Appeals [*sic*], and NWS's bankruptcy and attempts to stay the action. The case was designated complex and a discovery referee was

---

**14** The Attorney General also requested expert expenses in the amount of $4,372.50, which is not at issue in this appeal.

assigned. Numerous discovery motions were filed and NWS also attempted to re-litigate the personal jurisdiction issue on numerous occasions. Demurrers were filed and novel issues of Tribal immunity were raised. Ultimately, the Court granted the [Attorney General's] motion for summary judgment finding that they were entitled to $4,292,500 in civil penalties and permanent injunctive relief. The final judgment entered on December 28, 2016 found that NWS committed 476 violations of the Directory Statu[t]e, 229 violations of the Fire Safety Act and 96 violations of 15 U.S.C. § 376."

The trial court noted the Attorney General voluntarily applied a 10 percent reduction to the hours worked on the case to account for inefficiencies in billing and also "deducted the time spent by attorneys who did not materially contribute to the action." The trial court, however, determined that a further reduction was required. The order states: "The Court would note, that despite the reductions made by the [Attorney General], the billing entries do contain a level of vagueness which suggest some inefficiency in the billings which may not have been captured by the voluntary reductions by the [Attorney General]. To that end, the Court finds that an additional downward reduction is necessary with respect to some of the attorney's hours. The Court reached this conclusion after carefully reviewing the time records. The lodestar calculated by the [Attorney General] appears to have already reduced 10% from the hours listed and thus in order to reflect the additional reductions based on its review of the records, the Court will reduce the hours further [to] reflect what it perceives are inefficiencies that were not captured by the [Attorney General's] 10% reduction. This essentially amounts to an additional 5% reduction (the Court rounded to the nearest quarter hour)."

The trial court awarded the Attorney General $3,843,981.25 in attorney fees and $9,119.25 in expert expenses, for a total of $3,853,100.50.

B

*The Trial Court Did Not Err*

" 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.' " (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.) " 'The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] 'The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' " (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1096.)

NWS first raises a procedural challenge claiming neither the trial court's order granting the Attorney General's motion for summary judgment nor the final judgment "expressly provided that the [Attorney General is] entitled to an award of attorney's fees," and, therefore, the Attorney General was not entitled to such an award. NWS believes "[t]he lack of an express award of attorneys' fees is critical because a party seeking an award of fees pursuant to Rule 3.1702 of the California Rules of Court must first obtain a determination from the Court that it is entitled to an award of attorneys' fees" and no such determination was made prior to the Attorney General's filing of the attorney fees motion. As NWS acknowledges, however, the final judgment did provide that the Attorney General was "entitled to costs in an amount to be determined by a bill of costs," and, as the Attorney General correctly points out, attorney fees are an element of costs under California law. (*Meister v. Regents of University of California* (1998) 67

30

Cal.App.4th 437, 450 ["Statutory attorney's fees are an element of costs"]; Code Civ. Proc., § 1033.5, subd. (a)(10)(B).) Further, nothing in California Rules of Court rule 3.1702 requires the trial court to make an express determination of entitlement to attorney fees prior to a party filing a motion requesting such an order. Thus, we find no merit in this argument.

NWS's second complaint is that the trial court did not provide "NWS with the opportunity to conduct limited discovery to determine if the Office of the Attorney General has an internal policy regarding the hourly rates of its attorneys and paralegals." It argues "[d]iscovery was necessary because there appeared to be an inconsistency in the amount of fees that the [Attorney General] requested in this case." NWS specifically points to a different hourly amount stated in support of the attorney fee motion ($500) as compared to the "state agency rate" identified by declarations in support of prior discovery motions ($170).

The trial court rejected NWS's request to stay the hearing on the attorney fee motion to allow NWS an opportunity to conduct discovery regarding the Attorney General's internal hourly rates policy, explaining the Attorney General was "permitted to seek recovery based on private sector rates and thus the fact that the [Attorney General] may have internal rates that are lower than such rates does not preclude the Court from making a determination as to a reasonable hourly rate." We agree. Such discovery would have been irrelevant to the trial court's determination of the appropriate hourly rate since the Attorney General was entitled to the prevailing market rates irrespective of any internal hourly rates policy. (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 643 [fee awards are properly calculated based on prevailing market rates regardless of the actual costs to the prevailing party]; *Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 701 ["There is no requirement that the reasonable market rate mirror the *actual* rate billed"].)

NWS's final contention is that the amount of the attorney fee award was unreasonable. It attacks both factors in the lodestar equation: (1) the number of hours -- arguing the total number was excessive and some of the hours lacked authentication, and; (2) the hourly rate -- arguing judicial estoppel precluded the Attorney General from seeking a greater hourly amount than that reflected in the Attorney General's internal policy, and the rates were too high for the Sacramento market. As we explain, the trial court appropriately rejected all of these arguments.

The trial court did not abuse its discretion in calculating the number of hours pertinent to the lodestar formula. The trial court noted the Attorney General voluntarily applied a 10 percent reduction to the hours worked to account for inefficiencies in billing and made other deductions such as deducting the time spent by attorneys who did not materially contribute to the action. The trial court then further reduced the hours by another 5 percent to account for additional inefficiencies found in the billing records. The trial court exercised its discretion, and NWS points us to nothing in the record suggesting the court abused its discretion.

That eight attorneys in the Attorney General's Office worked on the matter (although only two of the attorneys billed the bulk of the time) and the hours spent by the Attorney General's Office were greater than those spent by NWS's current attorneys (even though NWS does not include the hours of its prior counsel in its calculation), while relevant, do not establish an abuse of discretion by the trial court. Additionally, NWS's attempt to minimize the scope of the litigation does not square with the actual history of the case, as described by the trial court in the order.

NWS's challenge to the authenticity of certain hours included in the Attorney General's attorney fee motion fares no better. NWS argues the hours for work performed

by an attorney and a paralegal must be disregarded because the two individuals did not provide personal declarations of their time spent or of their hourly rate. The trial court found sufficient a declaration submitted by the individuals' supervisor, which detailed the individuals' experience and attached their respective time records from an electronic timekeeping system. We are aware of no statute or case law requiring the type of documentation NWS demands. The trial court has the discretion to award fees based on its own view of the number of hours reasonably spent. (*Syers Properties III, Inc. v. Rankin*, *supra*, 226 Cal.App.4th at p. 698.) We see no reason why the trial court could not accept the supervisor's declaration attesting to the hours entered into the electronic timekeeping system, particularly since the trial court was in the best position to verify the claims given the proceedings before it. Thus, we find no abuse of discretion.

Turning to the amount of the attorney fees, NWS argues the trial court should have rejected the Attorney General's asserted rate of $500 per hour for the work of attorney Michelle Hickerson on judicial estoppel grounds because she submitted a sworn declaration in support of discovery motions declaring her hourly rate to be $170 -- "a rate that is 66% less than the $500 per hour that was awarded for Ms. Hickerson's time." NWS asserts the trial court should have reduced the Attorney General's asserted rates for the other attorneys by 66 percent as well, "especially because it is likely the Office of the Attorney General has a policy that sets hourly rates at an amount much less than those requested in the [attorney fees motion]." The Attorney General argues the trial court properly rejected this argument because judicial estoppel is inapplicable under these facts.

We agree with the trial court and the Attorney General, the doctrine of judicial estoppel has no application here. " ' "Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an

incompatible position. [Citations.] The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [Citation.] Application of the doctrine is discretionary." ' [Citation.] The doctrine applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987.) "It should be invoked, however, only in egregious cases [citation] where a party misrepresents or conceals material facts [citation]." (*Safai v. Safai* (2008) 164 Cal.App.4th 233, 246.)

The Attorney General's use of a $170 hourly rate in connection with discovery motions may well reflect the office's internal policy setting rates; however, as explained *ante*, it does not preclude the Attorney General from seeking prevailing market rates in its attorney fee motion. The different hourly rates are also not contradictory because one is an internal hourly rate and the other is a prevailing market hourly rate -- one does not necessarily exclude the other. (See *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 960 [judicial estoppel cannot be invoked where the first position was not clearly inconsistent so that holding one position necessarily excludes the other].) Further, NWS does not explain how (nor do we see how) the Attorney General sought to gain an advantage by stating the internal hourly rate of $170 in the discovery motions, such that judicial estoppel is appropriate. And, as the trial court noted during oral argument, NWS did not claim any prejudice or that it would have changed its position had it known of the different market rate. NWS has, therefore, failed to show that this is the type of egregious case that warrants the application of judicial estoppel.

We also do not agree with NWS that the hourly rates used in calculating the attorney fee award were too high for the Sacramento area. As the trial court said in its order: "Here, while NWS argues that the rates requested are out of line with market rates, it offers no evidence to counter the [Attorney General's] expert's opinion (again a leading attorney's fees expert) that the rates are in line with prevailing market rates in the Sacramento legal marketplace for attorneys of reasonably comparable experience, skill, and expertise for reasonably comparable services."

The unreported federal district court cases and the California superior court case cited by NWS are of no assistance given the factual distinctions in this case. And, NWS's own attorney fees, while relevant, also does not render the Attorney General's rates unreasonable. (See *Mountjoy v. Bank of America, N.A.* (2016) 245 Cal.App.4th 266, 281 [although " '[a] comparative analysis of each side's respective litigation costs may be a useful check on the reasonableness of any fee request' [citation], such a comparison, by itself, cannot establish the reasonableness of a particular fee award"].) Further, the United States Consumer Law Attorney Fee Survey Report for 2013-2014 is irrelevant because the trial court credited the Attorney General's expert's opinion that "the report does not provide rates for attorneys of similar skill and experience in the Sacramento market and in any case, the requested rates are close to or even lower than rates in that report." It was within the trial court's discretion to credit the expert's opinion.

Ultimately, "[t]he ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) The trial court's determination of the hourly rates was not clearly erroneous.

35

## DISPOSITION

The judgment and order awarding attorney fees are affirmed.  The Attorney General shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/

Robie, J.

We concur:

/s/

Blease, Acting P. J.

/s/

Mauro, J.